LUMBER CO. v. RAILROAD—"RAILROAD DISCRIMINATION
CASE."

(Filed November 15, 1904).

CARRIERS—*Freight—Acts 1899, ch. 164.*

> A railroad carrying logs to a saw-mill cannot charge a shipper
> agreeing to ship the manufactured product by the same line
> less for the same service than it charges a shipper who makes
> no such agreement.

ACTION by the Hilton Lumber Company against the At-
lantic Coast Line Railroad Company, heard by *Judge George
H. Brown* and a jury, at Spring Term, 1904, of the Superior
Court of NEW HANOVER County. From a judgment for the
defendant the plaintiff appealed.

*Rountree & Carr,* for the plaintiff.
*Junius Davis,* for the defendant.

CLARK, C. J. The gist of this action is for discrimina-
tion by the defendant in charging the plaintiff a higher rate
on logs to the plaintiff's mill in Wilmington than was charged
others for like service, and to recover the overcharges which
had been paid under protest. The point presented is not
that the rate, $2.50 per thousand feet in car-load lots charged
the plaintiff, is *per se* unreasonable, but that the rate charged
others for the same service for the same distance was $2.10,
and that this is a serious discrimination which if continued
will result in the crippling or destruction of the plaintiff's
mill and the building up of other mills which are in competi-
tion with the plaintiff, for it has in five months amounted
to $3,900, for the recovery of which this action is brought.

The Court charged the jury: "If you find that the rate
of $2.10 per thousand feet was charged and collected by the

defendant upon logs shipped over any part of its railroad to a mill or mills at which logs were manufactured into lumber itself reshipped over the railroad of the defendant, or any part of it, and that the reduced rate of $2.10 per thousand feet was given to such mill in consideration of such fact that they would ship the lumber manufactured out of the said logs over the line of the defendant's road, which said agreement was open to all mills that wished to accept it, then it would not be an unjust or illegal discrimination to charge $2.50 per thousand feet, which it is not contested is a reasonable rate to mills which did not ship their manufactured lumber over the line of the defendant road."

The proposition herein stated is that a common carrier has a right to charge one person a lower rate of freight than another for shipping the same quantity, the same distance, under the same conditions, provided the shipper give the company a consideration (shipping the manufactured lumber subsequently over its line), which its managers think will make good to it the abatement of rate given to such parties. But if this is equality as to the treasury of the company, it is none the less a discrimination against the plaintiff. It is charged $2.50 while others are charged $2.10 for the same service. It is true if the plaintiff should choose to agree to ship its manufactured lumber out of Wilmington over the defendant's line it could get the same reduction of rate on its logs into Wilmington. On those conditions it could save itself from being discriminated against. But suppose the plaintiff should wish to sell its lumber in Wilmington, or can ship it at a lower rate by sea, or even by a competing railroad line out of Wilmington, has it not the right to do so? Should it see fit to exercise that right, has the common carrier the power to place a penalty of a 19 per cent. higher rate on the plaintiff and to charge it $2.50 for

bringing its logs to Wilmington when it charges others $2.10 for exactly the same service?

The principle involved is a vital one to the public at large, for upon this alleged right to discriminate by common carriers (exercised either openly or secretly by rebates), nearly all trusts, and especially the Standard Oil Company, have been built up to their present disquieting and menacing predominance, as has been fully shown by the investigation and report of the Industrial Commission and the Interstate Commerce Commission, both appointed by acts of Congress.

Under the same idea that the test was the fact that the railroad company would not lose by the favor (extended in the present case by charging certain shippers $2.10 while charging the plaintiff $2.50), another railroad company charged the Standard Oil Company 10 cents per barrel while charging its competitors 35 cents per barrel, and paying 25 cents of the 35 cents thus collected to the Standard Oil Company. *Handy v. Railroad,* 31 Fed., 689. The railroad company in that instance must have found *its* offset, its profit, somewhere or it would not have made that arrangement. But what became of the competitors of the Standard Oil Company?

Here, the railroad company will doubtless make up out of its forced monopoly of shipping out of Wilmington the lumber to be manufactured out of all the logs hauled in by it, the 40 cents which is deducted in favor of those who will give it that monopoly. But why should it discriminate by charging the plaintiff $2.50 instead of $2.10, *i. e.,* charge 19 per cent. higher rates upon logs which when turned into lumber are sold in Wilmington, or shipped by sea, or shipped by a competing route? It cost no more to bring in the plaintiff's logs than the logs for whose hauling only $2.10 was charged. The shipment of logs to Wilmington is one transaction; the shipment of lumber out is another. The defend-

ant cannot charge the plaintiff higher on the logs because it will not agree to ship its lumber by the defendant's line. It is no answer to say that if the plaintiff will come into the defendant's terms it will get the same discount. The defendant might as well say if you will carry your logs to a saw-mill in which the railroad company is a large owner you will get 19 per cent. reduction in freight on your logs, and there is no discrimination, for the same offer is open to you as to others.

If the plaintiff, like others, was shipping logs to Wilmington with the voluntary intention of shipping by the defendant's road, say to New York, then certainly there would be no discrimination. But the plaintiff does not wish to ship to New York over the defendant's line, and the defendant proposes "to put the screws to the plaintiff" and make it do so whether it wishes to do so or not, and if the plaintiff does not do so, the defendant says the plaintiff cannot be treated as well as others as to the rates for hauling its logs, but must pay nearly one-fifth (19 per cent.) higher rates on its logs. That is the very point at issue. Hauling its logs to Wilmington is the only service the plaintiff seeks at the defendant's hands. Why should it pay higher for that service than those who agree to carry their logs to the defendant's mill or to ship out their lumber by the defendant's road.

Discrimination is a more dangerous power than high rates—if the latter is charged impartially to all. Hence the statutes of Congress and of the State, while leaving the fixing of rates in the hands of commissions, have directly and strictly forbidden, under penalties, any discrimination. Common carriers are fixed with a public use. They exercise a branch of the public franchise. They can condemn rights of way solely because the land "is taken for a public use." They are subject to governmental supervision and to the reduction or regulation of their charges by the Legislature directly or by

commissioners appointed by its authority. *Munn v. Illinois,* 94 U. S., 113, and citations to same; 9 Rose's Notes, 21-55. In all the great countries of the world, except England and this country, the railroads are largely or altogether owned and operated directly by the government, as was formerly the case in North Carolina. In all countries alike it is recognized that it is of vital importance that corporations exercising such public use must be absolutely impartial and equal in their charges for the same service.

All the service the plaintiff asks of the defendant is to haul its logs to its saw-mill in Wilmington. For this it charges the plaintiff $2.50; it charges others $2.10, *i. e.,* 19 per cent. higher to the plaintiff than to others for exactly the same service. It costs the defendant no more to render that service to the plaintiff than to render the same service to others. It must charge all alike.

Could the defendant discriminate on shipment of logs to Wilmington—for a consideration of a subsequent benefit to itself by obtaining a monopoly of shipment of lumber out of Wilmington—it could seriously damage the business and prosperity of that city. At that point are steamships and sailing lines and other railroads, and this competition making the town a distributing center is the source of its prosperity. If the terms upon which the defendant will haul logs into Wilmington are that it must haul the lumber out, then Wilmington ceases as to that business to be a competing point. The same discrimination could be made (if this were allowable) in freight on cotton or corn or rosin and other articles carried to Wilmington to be manufactured or put into other forms for use. Discriminating rates as in this case could be charged on the raw product which would permit of the manufactured article, cloths, yarn, meal, whiskey, turpentine and the like being shipped out only over the defendant's line. This is to place the prosperity of Wilming-

ton, and also of the producers of raw material contiguous to that city along the lines of any of the defendant's roads or branches, in the control of the defendant.

The point here presented has been often decided and always, certainly at least in recent years, against the power claimed by the defendant. In *Baxendale v. Railroad,* 94 E. C. L., 308, after an elaborate argument, it was held by a very strong Court as to this very point: "It is not a legitimate ground for giving a preference to one of the customers of a railroad company that he engages to employ other lines of the company for the carriage of traffic distinct from and unconnected with the goods in question; and it is undue and unreasonable to charge more or less for the same service according as the customer of the railway thinks proper or not to bind himself to employ the company in other and totally distinct business."

In *Monacho v. Ward,* 27 Fed., 529, where the Court was enlightened by the argument of Frederick Coudert and James C. Carter on opposing sides, it was held that "a common carrier cannot charge a higher rate against shippers who refuse to patronize it exclusively." President Hadley, in his "Railroad Transportation," 108, a valuable work, by no means unfavorable to railroads, says: "A difference in rates, not based upon any corresponding difference in cost, constitutes a case of discrimination." In *Railroad v. Goodridge,* 149 U. S., 680, it is said: "It is no proper business of a railroad company as a common carrier to foster particular enterprises or to build up new industries; but deriving its franchises from the Legislature and depending upon the will of the people for its very existence, it is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all its patrons on an absolute equality." This would not be the case if a patron shipping logs to Wilmington must

pay higher for that service than one who subsequently ships lumber.

Among the numerous cases condemning discrimination, and holding that freight paid in excess of that charged others for the same service can be recovered back, are *Hays v. Penn. Co.,* 12 Fed., 309, and cases cited in note thereto; *Handy v. Railroad,* 31 Fed., 689, a spicy opinion by a justly indignant Judge. It was held that charging from New Orleans to San Francisco a lower rate on goods shipped to New Orleans from London than upon the same goods shipped from New York to New Orleans was an unjust discrimination, and illegal. *Commission v. Railroad,* 52 Fed., 187. It is not the question of profit to the carrier, so the Court holds, in attracting shipments which would not otherwise come to it, but the injustice of charging differing rates for the same service, and the Court quotes with approval the English decisions, *Harris v. Railroad,* 3 C. B. (N. S.), 693; *Evershed v. Railroad,* 2 Q. B. Div., 254, that "preferences given to shippers to induce them not to divert traffic from the carrier or to induce them to transfer traffic which otherwise would go to another carrier, are unlawful and cannot be justified upon the ground of profit to the carrier allowing them." To similar purport, *Wright v. U. S.,* 167 U. S., 512; *Packet Co. v. Railroad,* 60 Fed., 545; *Railroad v. Wilson,* 132 Ind., 517, 18 L. R. A., 105, and many others. Even when the discrimination is based on a larger quantity being shipped it is illegal, when the smaller quantity, as in car-load lots, costs no more to handle in proportion to the quantity. *Kinsley v. Railroad,* 37 Fed., 181, approving *Hays v. Penn. Co., supra.*

The vice in the discrimination here shown is twofold: (1) It necessarily tends, if allowable, to build up defendant's railroad and break down competing carriers, which is forbidden by public policy. Joint Traffic Case, 171 U. S., at

p. 505. (2) The condition upon which the right to the lower rate was given was secret, not written on the face of the schedule which, as reported to the railroad commission and printed for public information, was $2.50. A secret rebate is prohibited by statute and by all the decisions of the courts, yet this rebate of 40 cents not allowed the plaintiff has amounted to $3,900 in five months time.

The testimony of railroad officials in the report to Congress of the Industrial Commission, Vol. IV, p. 273, and Vol. IX, p. 131, shows that the methods of discrimination resorted to are many, and that manufacturers especially can be made or destroyed at the will of railroad managers unless there is the most absolute and exact equality to all in the same charge for the same service. Vol. IX, pp. 287, 289, Report of Industrial Commission. *Commission v. Railroad,* 128 Fed., 59, is one instance of an ingenious discrimination. The present case is another. Discrimination is Protean in the divers forms it assumes. The argument in all countries in favor of governmental ownership of railroads is based upon the deadly effect of discrimination in rates under private ownership, and the difficulty in preventing it, rather than upon higher rates. The condition upon which private ownership of railroads can or will be maintained in England and this country (which alone retain it) is the strict and effective enforcement of equality in charges to all for the same service, under the same condition and at the same cost— as is required by the statutes both State and Federal.

The defendant cannot justify under what is known as "Milling in Transit." Those are cases where freight is shipped a long distance and the carrier will, at his own cost, defray the expense of its change in form *en route* because of the easier handling in the more compact shape, as, for example, *Cowan v. Bond,* 39 Fed., 54, where a railroad com-

pany receiving cotton in Louisiana for shipment to mills in New England had it compressed *en route* at Vicksburg at its own expense, charging the shipper no more than if it had carried the uncompressed cotton all the way, the same privilege being open to all shippers. That has no analogy to this case, where the plaintiff is shipping logs to its mill in Wilmington and is charged nearly one-fifth more freight than others, unless it will agree to ship its lumber out of Wilmington over the defendant's road. Among other cases in point are Lumber Case, 9 I. C. C., 569, at pp. 572, 579, 580; the "Tap Lines" Cases, 10 I. C. C., 193; *Packet Co. v. Railroad, supra.*

There are other errors assigned in the admission of evidence, in the charge, and in matters of practice, but in view of the error in this matter of vital interest to the public at large and especially to the business interests of the State, it will be unnecessary to consider them. The plaintiff had a right to have its logs carried to its mill at the same rate as others, without binding itself to ship its lumber by the defendant's line, or indeed to ship it at all.

But independent of any decisions, our statute (which nearly copies the English "Traffic Act" and the United States "Interstate Commerce Act" in this and many other respects) is too explicit to be misconstrued. The "Corporation Commission Act," Acts 1899, chap. 164, provides (sec. 13) that if any common carrier shall charge or collect "from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands or collects, or receives from any other person or persons for doing for him or them a like and cotemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and con-

ditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

Error.

MONTGOMERY, J.   I concur in the result.

CONNOR, J., concurring.   I concur in the conclusion reached by the Court in this case.   I do not think that the defendant can make the attempted discrimination between its customers.   I am further of opinion that upon the whole evidence it does not sufficiently appear that the plaintiff knew of the rebate allowed, or that it was given that publicity which the law requires to make it uniform and open to all persons engaged in shipping.   There are views either expressed or intimated in the opinion in respect to questions which I do not feel called upon to express any opinion. They appropriately belong to another sphere of discussion. I simply concur in the decision of the question presented by the plaintiff's exceptions, and think there should be a new trial.

WALKER, J.   I concur in this concurring opinion.