FLETCHER PAPER CO. *v.* DETROIT & MACKINAC RAILWAY CO.[1]

ISLAND MILL LUMBER CO. *v.* SAME.

RICHARDSON LUMBER CO. *v.* SAME.

CHURCHILL LUMBER CO. *v.* SAME.

MICHIGAN VENEER CO. *v.* SAME.

1. CARRIERS—FREIGHT RATES—ORDER OF RAILROAD.COMMISSION.
   Where the Michigan railroad commission determined that certain rates previously published and exacted from shippers by a carrier were unreasonable and ought not to be exacted, and that other rates were and would be reasonable and proper to be exacted and should thereafter be exacted, there was created a legislative rate, immediately in effect, although liable to be set aside by the courts.

2. SAME—FREIGHT RATES—ILLEGAL CHARGES—STATUTES.
   Upon the railroad commission deciding that a certain rate charged a shipper is unreasonable, and that another is reasonable, a shipper may recover the money illegally exacted through the charging of a higher than the fixed rate, irrespective of whether it declare upon Act No. 300, Pub.

[1]Removed to the Supreme Court of the United States by writ of error January 2, 1918.

Acts 1909, § 10, subd. *g* (2 Comp. Laws 1915, § 8118*g*), and the action of the commission or on the common counts.

3. SAME.

If the charges exacted by a carrier have been duly fixed by the railroad commission, and are attacked, the commission should be first applied to, since it is the rate-maker, and it would be wholly incongruous from an administrative standpoint to have successive juries, or different courts or judges, passing upon the reasonableness of a rate already fixed by the commission.

4. SAME—FREIGHT RATES—VALIDITY.

In an action by a shipper against a carrier to recover the difference between the amount paid under a tariff published by defendant and that designated by the railroad commission, the question of the reasonableness of the exactions was not a proper one for consideration.

5. SAME.

Where rates charged by a railroad are condemned by the railroad commission as unreasonable, and new ones approved as reasonable, the collection of the old rate while a temporary injunction against the new rate is in effect does not legalize the exaction nor prevent recovery of the excess charges by the shipper, upon the representations upon which the injunction was based later being shown to be unfounded. .

6. SAME.

An order of the railroad commission fixing rates to apply to a shipper of logs when manufactured product is reshipped via the carrier's line, and, when not so shipped, allowing the collection of an additional charge per thousand feet, to be refunded, however, if shipper later ships out the manufactured product, or some part of it, does not provide for a rebate or discrimination, and is not necessarily unlawful, under Act No. 300, Pub. Acts 1909, § 11 (2 Comp. Laws 1915, § 8119), providing that nothing in the act shall be construed to prevent concentration, commodity, transit and other special contract rates, but all such rates shall be open to all shippers for a like kind of traffic under similar circumstances and conditions.[1]

[1]As to right of carrier to make discriminating rate for material to be employed in manufacture of a finished product which will be shipped over its road, see note in 6 L. R. A. (N. S.) 225.

On recovery back of excessive payments to public service corporations, generally, see note in 18 L. R. A. (N. S.) 124.

7. SAME.

The order of the railroad commission must be construed as referring to tonnage generally of a product similar to that of the logs shipped in and not of particular logs shipped in.

8. SAME—FREIGHT RATES—DOUBLE DAMAGES—STATUTES.

Where a carrier simply refused to put into effect a tariff ordered by the railroad commission which was temporarily suspended by injunction in a court of chancery and the shipper was compensated by the return of the money exacted with interest, double damages will not be awarded a shipper under Act No. 300, Pub. Acts 1909, § 19 (2 Comp. Laws 1915, § 8127).

Error to Bay; Coumans, J. Submitted June 20, 1917. (Docket Nos. 94-98.) Decided September 27, 1917.

Separate actions of assumpsit by the Fletcher Paper Company and others against the Detroit & Mackinac Railway Company for excessive freight charges. Judgments for plaintiffs. All parties bring error. Affirmed.

*Edward S. Clark*, for plaintiffs.

*James McNamara* and *Henry & Henry* (*Fred A. Baker* and *Weadock & Duffy*, of counsel), for defendant.

Act No. 312, Public Acts of 1907, required railroad companies to file with the Michigan railroad commission, and to post in their offices and depots, tariff rates. After the act became effective, the Detroit & Mackinac Railway Company, a Michigan corporation, whose main line extended from Bay City on the south northerly through Alpena to Cheboygan, and which had branches and spurs extending into timber sections adjacent to its line of railway, published, pursuant to the act, tariff rates. The schedules of tariff rates were

and are designated by the letters M. R. C., with numbers and other initial designations. February 20, 1909, a rate was published for carload shipments on logs between Alpena and what may be designated as the Fletcher dam, which provided a rate of $5 a car each way, and was designated M. R. C. 217. February 1, 1909, a rate was scheduled and published for carload shipments of logs to Alpena from various places on the lines of defendant railroad each way from Alpena, providing for a minimum of 2,500 feet per car, which fixed a rate on logs to Alpena from designated points north and south at $3 to $3.25 a thousand feet, and for a refund of 50 cents a thousand feet, the provision for the refund being:

"A refund of 50 cents per thousand feet on logs will be made when an equal amount of manufactured product is shipped out via the Detroit & Mackinac Railway."

It was known as M. R. C. 205. February 20, 1909, a rate was in like manner published for hauling logs in carload lots on a mileage basis, without reference to the places from or to which they were transported, and it contained the provision:

"The rates named herein apply only when the manufactured product is to be reshipped via Detroit & Mackinac Ry. and in the absence of tariff naming specific rates."

March 11, 1909, the Fletcher Paper Company filed with the Michigan railroad commission a complaint, alleging that the rate so fixed by M. R. C. 217 was unfair and retaliatory, praying for an order requiring the defendant to desist from violations of the law referred to in the said petition. To this the defendant filed a detailed answer. April 19, 1909, F. W. Gilchrist, the Churchill Lumber Company and Island Mill Lumber Company filed with the commission a complaint, alleging that defendant by its tariff M. R. C.

205 discriminated against Alpena shippers in favor of Cheboygan, and that the tariff was unjust and unduly discriminatory and higher than the rates established by M. R. C. 208, and prayed for an order requiring defendant to cease and desist from violations of the law and to publish and file rates shown on an attached statement. To this the defendant filed its answer. After the filing of the complaints, and before proofs before the Michigan railroad commission had been concluded, defendant published a schedule of rates, designated as M. R. C. 237, abolishing all discriminations in favor of Cheboygan. The testimony of the complaining parties and of the defendant was taken in June, 1909, and on October 22d of that year the commission made an order on the complaint last above referred to, the one made by Gilchrist and others, reciting that the matters alleged in the complaint were substantially true, and that the rates charged for the transportation of logs in carload lots to the said city of Alpena were unjust, unreasonable, and excessive, and ought to be reduced as therein set forth, and providing that the defendant railway company publish and file and put into operation so as to become effective 20 days from the service of the order a tariff for the transportation of logs in carload lots to the said city of Alpena according to rates set out in said order corresponding with M. R. C. 208. Following the statement of rates, the order contains the following:

"Above rates to apply when the manufactured product is reshipped via defendant company's line, and when not to be so reshipped, that defendant company are authorized to collect in addition to said rate, fifty cents (50c) per thousand (1,000) feet, but if later reshipment is made over defendant company's line, they are to refund to such shipper the fifty cents (50c) per thousand (1,000) feet collected."

No provision was made in this order for a minimum

carload lot, and on November 3d following the commission, without any further hearing, made a supplemental order, fixing the minimum at 2,500 feet per car.

Upon the complaint of the Fletcher Paper Company, and on October 19, 1909, the commission made an order, reciting that it appeared that the switching charge of $5 per car between Alpena and the dam (Fletcher dam or Broadwell dam) was unreasonable and unjustly discriminatory, and that a rate of $3.50 per car would be reasonable and just, and they ordered the defendant, within 20 days from the date of service of a copy of this order upon it, to file, publish, and put into force a rate for such switching charge not to exceed $3.50 per car in each direction on all commodities, and ordering that M. R. C. 217 be canceled, and that the defendant cease, after said 20 days, from charging more than $3.50 a car for such switching charges. The order relating to switching charges was served on defendant November 4, 1909, and the final order, relating to freight rates, was served on November 6, 1909. It is from the time they became effective, that is, 20 days after service, that plaintiffs compute their damages.

On June 2, 1909, Act No. 300 of the Public Acts of 1909 (2 Comp. Laws 1915, § 8109 *et seq.*), was approved, and it became effective in September. By its terms Act No. 312 of the Public Acts of 1907 was repealed so far as there was conflict between the two acts. The two acts are generally similar, and not different. As matter of fact, the defendant did not actually file, publish, and put into effect the schedule of rates provided for in the orders which have been referred to, but the schedules, as hereinbefore designated, continued, so far as their publication and enforcement were concerned, unchanged until February 18, 1915.

By Act No. 300, Pub. Acts 1909, § 22, it is provided:

"(*a*) Upon complaint in writing of any person, firm or corporation or association, or of any mercantile, agricultural or manufacturing society, or of any body politic or municipal organization, that any of the rates, fares, charges or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, or that any regulation or practice whatsoever affecting the transportation of persons or property or any service in connection therewith, is in any respect unreasonable or unjustly discriminatory, or that any service is inadequate, the commission shall notify the common carrier complained of that complaint has been made and shall furnish a copy of the said complaint with said notice, and twenty days after such notice has been given the commission may proceed to investigate the same as hereinafter provided. Before proceeding to make the investigation, the commission shall give the said common carrier and the complainants at least ten days' notice of the time and place when and where such matters will be considered and determined, and said parties shall be entitled to be heard and shall have process to enforce the attendance of witnesses. Such hearings may be continued from time to time in the discretion of the commission. If, upon such investigation, the rate or rates, joint rate or rates, fares, charges or classifications, regulation, practice or service complained of shall be found to be unreasonable, inadequate or unjustly discriminatory, the commission shall have power to and it shall determine and by order fix and order substituted therefor, such rate or rates, joint rate or rates, fares and charges, as is or are just and reasonable, and which shall be the maximum to be charged in the future, and such classifications, regulation, practice or service as is or are just, reasonable and adequate, and which shall be imposed and followed or service rendered in future in lieu of that found to be unreasonable, inadequate or unjustly discriminatory, and in either case the commission shall make an order that the common carrier cease and desist from such violation, and shall conform to the regulation and practice so prescribed, and it shall cause a certified copy of

each such order to be delivered to an officer or station agent of the common carrier affected thereby, which order shall, of its own force, take effect and become operative twenty days after the service thereof." * * *

By section 25 it is provided that all rates fixed by the commission, and all regulations, practices, and services shall be in force and shall be *prima facie* lawful and reasonable—

"until finally found otherwise in an action brought for the purpose pursuant to the provisions of section twenty-six of this act or until changed or modified by the commission."   *   *   *

Every carrier is required (section 4) to furnish reasonably adequate service, making just and reasonable charges therefor, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful. By section 10, subd. "*g*," it is provided:

"Within six months after the delivery of any shipment of freight at destination any person aggrieved may complain to the commission that the charge exacted for the transportation of such freight between points in Michigan is irregular or exorbitant, and thereupon the commission shall have power to investigate such complaint, and to hear the same and to decide upon the merits thereof, in the manner provided by section twenty-two of this act. If, upon such hearing, the commission shall decide that the rate or charge exacted is irregular or exorbitant it shall find what, in its judgment, would have been a reasonable rate or charge for the service complained of. If the rate or charge so found shall be less than the charge exacted the carrier shall have the right to refund to the person paying such charge the amount so found to be excessive. In case of the refusal of the carrier to make such refund, the party aggrieved thereby may maintain an action in the courts of this State, to recover the amount of such excessive charge as found by said commission, and in the trial thereof the findings of the commission shall be *prima facie* evidence

of the truth of the facts found by it, and no carrier shall be permitted to avail itself of the defense of such action that the shipment involved was in fact made on the published tariff rate in force at the time such shipment was made, but no carrier making a refund upon the order of the commission or pursuant to a judgment of court as herein provided, shall be liable for any penalty or forfeiture, or subject to any prosecution under the laws of this State on account of making such refund."

Section 19 reads:

"If any common carrier shall do, or cause to be done, or permit to be done, any matter, act or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by it, or by any lawful order made under the provisions of this act by the Michigan railroad commission, such common carrier shall be liable to the person, firm or corporation injured thereby in double the amount of damages sustained in consequence of such violation:  *Provided,* That any recovery as is in this section provided shall in no manner affect a recovery by the State of the penalty prescribed for such violation."

By section 26 is provided the method by which the carrier or other party in interest may seek to have set aside, in the circuit court, in chancery, any order fixing any rate or rates, in which proceeding the complaining party has the burden of showing "by clear and satisfactory evidence" that the order of the commission complained of is unlawful or unreasonable. One provision (*b*) of the section is that no injunction shall issue suspending or staying any order of the commission, except upon application to the circuit court, in chancery, or to the judge thereof.  Sections 32 and 47 are here set out:

"SEC. 32. Whenever, after hearing and investigation as provided in this act, the commission shall find that any charge, regulation or practice affecting the transportation of passengers or property, or any service

in connection therewith not herein specifically designated, is unreasonable or unjustly discriminatory, it shall have the power to regulate the same as provided in section twenty-two of this act."

"SEC. 47. In addition to all the other remedies provided by this act for the prevention and punishment of any and all violations of the provisions hereof and of all orders of the commission, the commission, and likewise any person, firm or corporation interested, may compel compliance with the provisions of this act and with the orders of the commission by proceedings in mandamus, injunction or by other appropriate civil remedies."

The defendant, following the provision of the statute, on November 20, 1909, filed its bill of complaint in the circuit court for the county of Wayne, in chancery, alleging reasons why the said orders of the Michigan railroad commission should not become effective and operative and why the defendant should not publish a schedule of rates pursuant to such orders. It asserted that the proposed rates were unlawful and unreasonable, were not subject to the regulation or control of the commission, were in conflict with the constitutional provisions and laws of the State, and in violation of the due process of law clause of the 14th amendment to the Constitution of the United States. It prayed, among other things, for a temporary injunction restraining the commission from enforcing, or attempting to enforce, such orders or making them effective. The chancellor made an order requiring the commission to show cause on the 24th of November, 1909, why such an injunction should not issue, and, no one appearing at the time named in the order to show cause, a hearing was had, and, defendant being represented in court, a restraining order was issued, requiring the commission to—

"desist and refrain from putting into operation or making effective three orders of said Michigan railroad commission directed to the Detroit & Mackinac

Railway Company, said complainant, dated respectively October 22, 1909, October 19, 1909, and November 3, 1909, known and set forth in complainant's bill of complaint as Exhibits 1, 2 and 3, which said orders undertake to make a new tariff for the transportation of logs in carload lots to the city of Alpena over the Detroit & Mackinac Railway Company, other than the ones now in force and effect on said complainant's railroad, until the further order of this court."

Later, on December 2, 1909, a stipulation was made in writing, signed by the solicitor for the complainant and the attorney general of Michigan, which, omitting the title, is as follows:

"It is hereby stipulated by and between the attorneys for the respective parties hereto that the application for an injunction and the order to show cause made by said court, and the hearing thereon may be and is hereby continued in its present state until the final determination of said cause upon the merits thereof."

The Fletcher Paper Company, Frank W. Gilchrist, Churchill Lumber Company, and the Island Mill Lumber Company upon their petition were permitted to intervene with the Michigan railroad commission as defendants in the chancery suit, and various parties were, in like manner upon petition, permitted to intervene as parties complainant, and all of such intervening parties, defendants, and the Michigan railroad commission filed answers to the bill of complaint; and, the cause being at issue, proofs were taken, heard, and a final decree dismissing the bill was entered therein, which decree was signed February 11, 1911. As originally submitted, the decree contained a provision for the dissolution of the injunction, which provision was struck out by the judge who signed the same. An appeal was taken from the decree of the Wayne circuit court to the Supreme Court, was heard, and the decree of the lower court was affirmed. *Detroit, etc.,*

*R. Co.* v. *Railroad Commission*, 171 Mich. 335 (137 N. W. 329). Later a writ of error to the United States Supreme Court having been refused unless defendants would execute a bond for the benefit of interested parties, which the defendants did not do, and an application for a writ of certiorari to the United States Supreme Court having been denied by one of the Justices of that court, the defendant, on August 17, 1912, filed a bill of complaint in the district court of the United States for the eastern district of Michigan, southern division, in equity, asking for a review of the orders of the railroad commission as to their legality and effectiveness, and applying also for a temporary injunction. The commission filed an answer to the bill and to the motion for injunction, and the matter was submitted September 27, 1912, to three Federal judges, who, on the 22d of March, 1913, filed an opinion denying the motion for temporary injunction, from which decision an appeal was taken to the United States Supreme Court, the return on such appeal being filed June 28, 1913. The commission and other defendants moved to dismiss such appeal or affirm the decree, and that court, December 14, 1914, affirmed the decree. *Detroit, etc., R. Co.* v. *Railroad Commission*, 235 U. S. 402 (35 Sup. Ct. 126). A motion of the commission to amend the decree in the principal cause was denied. 178 Mich 250 (144 N. W. 689). June 16, 1914, the Michigan railroad commission petitioned the Supreme Court of Michigan for a writ of mandamus to compel the defendant to file and publish the orders made by the Michigan railroad commission and comply with their provisions, which writ was granted pursuant to the petition July 25, 1914. *Michigan Railroad Commission* v. *Railway Co.*, 182 Mich. 234 (148 N. W. 385). The defendant, on August 15, 1914, published a tariff of rates on the transportation of logs to Alpena, which was not approved, where-

upon contempt proceedings against the defendant were instituted and were disposed of February 4, 1915. *Michigan Railroad Commission* v. *Railway Co.*, 184 Mich. 242 (150 N. W. 861). February 18, 1915, a tariff was published by the defendant, followed by a further motion in the contempt proceeding. Defendant moved to amend and modify the opinion reported in 184 Mich. 242 (150 N. W. 861). These motions were submitted April 6, 1915, and were denied April 22, 1915. *Michigan Railroad Commission* v. *Railway Co.*, 185 Mich. 649 (152 N. W. 193). In the opinion of this court then delivered, one of the contentions of the relators is thus debated and disposed of:

"The second contention of relators again raises the question of the construction of the following paragraph contained in the order of the railroad commission, which was put into effect on February 19, 1915:

" 'Above rates to apply when the manufactured product is reshipped via the Detroit & Mackinac Railway Company. And when not to be so reshipped, the railway company will collect in addition to the above rates fifty (50) cents per thousand feet. But if later reshipment is made over the Detroit & Mackinac Railway, the company will refund to such shipper the fifty (50) cents per thousand feet collected.'

"It is shown by relators in this application that the respondents construe this clause as permitting them to charge in all instances the extra 50 cents per thousand feet and to rebate the same only when it is shown that the manufactured product is reshipped via the respondent railway company's lines, and this is urged by relators as a reason why a penalty should be inflicted. The construction given to this clause of the order by the respondents was urged upon the court in the original contempt proceeding, and we there held that their contention was untenable; this for the reason that they were plainly in contempt in failing to comply with the order of this court by putting into effect the orders of the railroad commission, as they were directed by this court to do. Having obeyed the order of the court by filing the rate fixed by the com-

198—Mich.—31.

mission, we are of opinion that their contention with reference to its construction may fairly receive consideration. A careful reading of the clause in question will serve to demonstrate its ambiguity. The last sentence of the clause, 'But if later reshipment is made over the Detroit & Mackinac Railway, the company will refund to such shipper the fifty (50) cents per thousand feet collected,' indicates very clearly that, in some instances at least, it was contemplated by the commission that the higher rate should be charged and collected, and the extra 50 cents refunded only after reshipment over respondent railway company's lines had been made. It would not seem reasonable to suppose that the commission intended one rule to apply to one shipper and another to another shipper; and such a result would be of doubtful legality even if intended. These views are based wholly upon the language of the clause in question, and are not predicated upon the contention of respondents that to compel them to carry, in the first instance, all logs at the lower rate, collecting the extra 50 cents only after they could make proof that the product had been reshipped over their line, would entail upon them unnecessary hardship and loss. Without determining that the construction given to the clause by the respondent is correct, we are satisfied that it is so far justified as to warrant us in withholding the infliction of a penalty upon relators' theory that, acting under such construction, respondents still continue in contempt."

April 3, 1915, the Fletcher Paper Company, Island Mill Lumber Company, Richardson Lumber Company, Churchill Lumber Company, and Michigan Veneer Company each began a suit against the Detroit & Mackinac Railway Company in the circuit court for the county of Bay, filing in the said causes, respectively, a declaration, alleging the right to recover from the defendant the difference between the amount paid by them as shippers under the tariff published by the defendant and the tariff designated by the said several orders of the Michigan railroad commission,

counting expressly on such orders, and including in their declarations the common counts in assumpsit. They served with the declarations bills of particulars, consisting of a summary by years of the alleged overcharges and interest thereon. The defendant in each case appeared and demanded a more specific bill of particulars, and moved to dismiss for want of jurisdiction, and thereafter, on May 12, 1915, demurred to each of the said declarations. Six grounds of demurrer were alleged, as follows:

"I. The common-law remedies for irregular, exorbitant, unreasonable or excessive charges or exactions by common carriers for the transportation of freight between points in Michigan have been abrogated and abolished by subdivision '*g*,' § 10, Act No. 300, Public Acts 1909, pp. 704, 715, as re-enacted by Act No. 139, Public Acts 1911, pp. 205, 209, the same being the acts of the legislature of this State, defining and regulating common carriers and creating the Michigan railroad commission.

"II. The plaintiff seeks reparation without having made any complaint to the Michigan railroad commission under said subdivision '*g*'; and the special counts of its declaration do not show that complaint had been made to the commission, or that the commission has made any findings or orders on complaints made under said subdivision.

"III. It appears by the special counts of the plaintiff's declaration that the orders therein set forth of October 22, 1909, and November 3, 1909, were not put in force by filing a schedule or tariff until February 18, 1915, and that the plaintiff's cause of action is for alleged excessive charges before that date.

"IV. It does not appear by the plaintiff's declaration that the order therein set forth of October 19, 1909, was ever put in force by the filing of a tariff or otherwise.

"V. No cause of action is set forth in the special counts of the plaintiff's declaration.

"VI. The plaintiff's bill of particulars shows that it has no cause of action under the common counts of

the declaration, other than the alleged causes of action in the special counts."

The motion to dismiss was denied, and an order overruling the demurrers was entered July 7, 1915. July 12, 1915, an application was made to the Supreme Court for a writ of certiorari to review the order overruling defendant's demurrers, which application, on July 23, 1915, was denied. Thereupon, July 23, 1915, the defendant pleaded, giving notice of certain special and affirmative defenses. A more specific bill of particulars was filed, with certain stipulations of counsel. On December 31, 1915, the following stipulation was filed in the cause:

"For the purpose of facilitating the trial of these cases, it is hereby stipulated as follows:

"A bill of particulars and a more specific bill of particulars have been furnished in the Fletcher Paper Company case, and bills of particulars similar to the more specific bill of particulars in the Fletcher Paper Company case have been furnished in all of the other cases. The more specific bill of particulars in the Fletcher Paper Company case has been checked by defendant, and certain amendments which have been agreed upon will be made by a stipulation to be hereafter filed. In the other four cases, the bills of particulars furnished will be checked over by defendant's accountants as rapidly as possible, and a list of the disputed or incorrect items (if any) will be furnished plaintiff's attorneys in each case as soon as possible, and an effort will be made to ascertain and agree upon the facts in regard to each. A stipulation covering the facts, so far as they can be agreed upon, will be filed in each case, leaving in dispute upon the trial only such items (if any) as cannot be disposed of by such stipulations. In order to satisfy plaintiffs that the work of checking up the bills of particulars is proceeding with reasonable speed, any representative of the plaintiffs may at any time make inquiries at the office of the defendant at Alpena, and will be given information in regard to the rate of progress that is being made.

"Defendant will make all possible efforts to complete the work of checking up the bills of particulars promptly, so that the cases may be tried at the earliest date consistent with the completion of that work. If that work can be completed during the December term of the circuit court for the county of Bay, then the said cases shall be placed upon the docket for that term to be tried as soon as possible thereafter. If there is any unreasonable delay on the part of the defendant, plaintiffs may apply to the court by motion on the usual four days' notice, and the court, on the hearing of said motion, may set the cases for trial or may make such other order as may seem to him proper for the purpose of expediting the preparation and trial of the cases.

"All of the cases shall be consolidated for trial as far as possible in the following manner:   All of the cases shall be submitted to the same jury (or to the court) at the same time. If the attorneys for all parties can agree that there are no questions for a jury, a jury will be waived by all parties. The parties will first introduce so much of their evidence as may apply jointly to all of the cases, and will then introduce separately the evidence applying to each one of the cases separately, and the court or jury shall make a separate finding or verdict as to each with the same effect as if they had been separately tried. A separate judgment shall be entered in each case."

The issues joined came on to be tried September 19, 1916, without a jury. Plaintiff's counsel offered in evidence the proceedings in the so-called rate cases, including the files, pleadings, evidence, record and briefs in all of the court hearings hereinbefore referred to, concluding with evidence of computations of the amounts claimed and interest to various periods in the progress of the rate cases proceedings, with other evidence and depositions.

It appeared, among other things, that the Fletcher Paper Company does not manufacture lumber. All forest products received by it are made into paper. In addition to what it receives via defendant's line, it also

receives logs by water. Ninety-eight per cent. of its output goes out over defendant's line. During six years, its average was 1,834 pounds of paper to 1,000 feet of logs. It shipped in by rail 20,481,619 feet of logs and shipped out by rail 117,408,337 pounds of paper. This shipment of paper represents the manufactured product of more than 64,000,000 feet of logs.

All of the manufactured product of the Michigan Veneer Company from logs shipped in by rail went out by rail excepting six boat shipments, during the six years in question. These were more than offset by the product of logs brought in by team.

In the cases of the Michigan Veneer Company and Fletcher Paper Company, the computation of plaintiffs' demand is made by using the flat commission rate, saying nothing about the 50 cents per thousand, and the rate actually paid.

The claims of the other plaintiffs are not materially different from each other. They operated sawmills, shipping out timber by rail and by water.

"Their claims for overcharges are first computed by subtracting from the amount paid on each shipment the commission rate without any allowance for the differential. Outshipments of lumber by rail are then shown, and are subtracted from the total amount of logs shipped in by rail. The difference represents such of the logs shipped in by rail as were not re-shipped by rail, and upon this difference the sum of 50 cents per thousand was computed and deducted from plaintiff's claim (in this way being added to the commission rate) as a penalty for failure to reship this part of the manufactured product by rail. In these cases it does not appear, and cannot be made to appear, just how much of the lumber reshipped by rail was sawed out of the individual logs that were shipped in by rail. The logs and the lumber were both necessarily confused in the process of manufacture, but the lumber reshipped was identical in every respect with the lumber manufactured from logs shipped in by rail,

and may have been actually manufactured from those logs."

Defendant made a statement of the defense, giving an outline of events connected with the matter in issue, and moved to dismiss the causes. Before that motion was decided, defendant offered to submit proofs in addition to the documentary evidence and other evidence before the court, which motions were taken under consideration. The offer to prove was calculated to present the issue that the rates fixed in the orders of the Michigan railroad commission were in fact confiscatory and therefore unlawful. Stated otherwise, the position asserted was that the rates collected were in fact fair and reasonable rates. Later, September 27, 1916, a motion was made and filed, praying for an order requiring plaintiffs to elect whether they would rely upon the statutory counts in their declarations, or whether they would rely upon the common counts in assumpsit and seek a recovery under a general common-law remedy. November 13, 1916, the court filed an opinion in the several causes, with findings of fact and conclusions of law, denying defendant's motion to dismiss, refusing proofs under defendant's offer, determining that each of the plaintiffs was entitled to the full amount of its claim, with interest, and directing that judgment should be entered November 20, 1916, in pursuance of said opinion, findings, and conclusions. On the 16th of November, 1916, the plaintiffs moved the court to double the damages indicated by the opinion and findings. This motion was denied, and, on November 27, 1916, judgments were rendered for the plaintiffs for the amounts of said overcharges, respectively, with interest at 5 per cent. from the time such overcharges were respectively made to November 13, 1916. The judgments were: For the Fletcher Paper Company, $25,788.76; Richardson Lumber Company, $28,239.65; Island Mill

Lumber Company, $24,534.33; Churchill Lumber Company, $14,336.13; Michigan Veneer Company, $6,-058.19.

A motion for a new trial was made by defendant, which was denied. The defendant excepted to the findings of fact and law, to the refusal to dismiss the proceedings and render a verdict of no cause of action, to the refusal to grant a new trial, and it is not claimed, and it does not appear, that the questions presented and argued upon the appeals are not properly saved. The defendant sued out its writ of error in each of said causes; the plaintiffs, excepting to the refusal of the court to double the damages, are also plaintiffs in error.

Three of the five plaintiffs, Fletcher Paper Company, Richardson Lumber Company, and Michigan Veneer Company, made no complaint to the railroad commission, and no order was ever made by the commission in their behalf upon their application, excepting the order with respect to the Fletcher Paper Company's switching rate. Two of the plaintiffs, Richardson Lumber Company and Michigan Veneer Company, did not intervene in the litigation to fix or enforce the said rates. All plaintiffs have, however, been treated alike in the proceedings had in the court below to the rendition of the judgments.

The principal questions presented and argued for defendant are:

(1) Whether a complaint to the Michigan railroad commission is not a necessary preliminary to any action by a shipper or consignee to recover excessive rates or charges which have been already collected by a carrier.

(2) Whether an injunction issued to prevent an order of the commission from taking effect, no bond being required from the carrier and no order impounding the overcharge, does not prevent the order from having any force or effect until the commission

obtains and serves a mandamus commanding the carrier to put the order into effect. (In this connection the effect of the stipulation entered into by the attorney general is discussed.)

(3) Was the defendant entitled to prove on the trial that the rates and charges it collected were just and reasonable?

(4) Should the court below have required the plaintiffs to elect whether they would seek to recover on common-law grounds or under the statute?

(5) Is the rebate of 50 cents per thousand feet of logs shipped into Alpena on the defendant railroad in case the manufactured product is shipped out thereon a legal discrimination against those who shipped out by water?

(6) Is there any ground on which any of the damages recovered or recoverable by plaintiffs can be doubled?

Plaintiffs state, also, substantially the same questions, as follows:

"(1) Is a freight rate fixed by a State railroad commission considered as the lawful rate, during chancery litigation to determine its legality?

"(2) To what extent is the chancery decree to be considered as *res judicata?*

"(3) Is the general rule changed by the delay of the railroad company in publishing and posting a new tariff in compliance with the orders of the commission?

"(4) Is the general rule affected by delay in the enforcement of the rate by mandamus?

"(5) Is the application of the general rule in this case changed by the injunction issued by the chancery court or the stipulation of the attorney general in respect thereto?

"(6) Is there any distinction between a common-law action and a statutory action in such a case, and has there been any failure to select the proper remedy or to follow any statutory requirements which are necessary preliminaries to such an action? (*a*) In general. (*b*) Defendant's offer of proof.

"(7) What are the plaintiff's rights in respect to an allowance for the outshipment of the manufactured

product? (*a*) Validity of provision for credit on re-shipment. (*b*) Construction and application.

"(8) Is the situation in any way affected by the motion for a new trial?

"(9) Plaintiff's motion for double damages and the cross writ of error based thereon. (*a*) Double damages not a penalty. (*b*) Rule to be applied if double damages are considered as a penalty.

"(10) 'Election of remedies.'

"(11) Defendant's demurrer."

OSTRANDER, J. (*after stating the facts*). The Michigan railroad commission determined that certain rates (charges) theretofore published and exacted from shippers by defendant were unreasonable and ought not to be exacted, and that certain other rates (charges) were and would be reasonable and proper to be exacted and should thereafter be exacted. The action of the commission furnished for the benefit of any and every shipper evidence that the old rates were illegal, the new rates reasonable and lawful. Although liable to be set aside by the courts, the result of what the commission did was a legislative rate, immediately in effect. *Michigan Cent. R. Co.* v. *Wayne Circuit Judge,* 156 Mich. 459 (120 N. W. 1073) ; *Michigan Railroad Commission* v. *Railroad Co.,* 159 Mich. 580 (124 N. W. 564) ; *Detroit, etc., R. Co.* v. *Railroad Commission,* 171 Mich. 335 (137 N. W. 329) ; *Michigan Railroad Commission* v. *Railway Co.,* 178 Mich. 230 (144 N. W. 696). See *Detroit, etc., R. Co.* v. *Railroad Commission,* 240 U. S. 564 (36 Sup. Ct. 424).

This point, a vital one, may be restated. The rates fixed by the commission were not effective when, and if, an attack upon them failed, but were effective at once and pending any attack upon them.

Attacks made by defendant upon the action of the commission failed. The commission has not itself modified its determination. It is admitted that defend-

ant has refused to conform to the orders of the commission, and has exacted from plaintiffs rates (charges) higher than those fixed by the commission. It has therefore money which in equity and good conscience belongs to the plaintiffs, which it ought to restore to them. Putting aside the question of the effect of the injunction and the question whether the statute has provided a method for recovering such exactions, no reason appears for denying to plaintiffs, or any other affected shipper, the right to recover from defendant all of the money so illegally taken from them, in an action of assumpsit in which it is wholly immaterial whether they declare upon the statute and the action of the commission or upon the common courts. As was said by Carland, J., in *Love* v. *North American Co.*, 229 Fed. 103 (143 C. C. A. 379):

"The railroad company got this money into its treasury by superseding rates that were fixed by authority of the State. When those rates were sustained, the carrier was bound to restore its excessive exactions. This was a duty not only to the shippers; it was a public duty owing to the State, whose orders had been superseded."

The action of the commission, in any event, furnishes the necessary evidence of the unlawful character of the exaction.

It is clear, I think, that plaintiffs have no statute remedy, and that the statute does not seek to interfere with or amend the remedy at common law. Plaintiffs base their actions precisely upon the action of the commission. Everything essential to a recovery, so far as the character of the exaction is concerned, has been determined by the commission, whose determination they rely upon. If it were otherwise, if the charges exacted by the defendant had been duly fixed according to the act and approved by the commission, and they were attacked, a different question

would be presented. In such a case, the commission, and not the courts, should be first applied to. In the first place, the commission is the ratemaker; in the second place, it would be wholly incongruous from an administrative standpoint to have successive juries, or different courts and judges, passing upon the reasonableness of a rate already fixed by the commission. To this effect are the decisions in *Texas, etc., R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426 (27 Sup. Ct. 350, 9 Am. & Eng. Ann. Cas. 1075); *Robinson* v. *Railroad Co.*, 222 U. S. 506 (32 Sup. Ct. 114); *Gimbel Bros.* v. *Barrett*, 215 Fed. 1004. These cases are authority, also, for the rulings of the trial court refusing to receive and consider offered evidence, and denying defendant the right to try out in these cases the question of the reasonableness of the exactions it made.

Defendant does, indeed, say that the charges made by it were once approved, and were published as its rates, and, until suspended, were lawful rates; this as a part of an argument which asserts that only the voluntary action of the carrier or the writ of mandamus can put into operation rates fixed by the commission. It makes little difference whether we do or do not say that the new rates were *in effect*, or whether we say they were in effect, but not in operation. The old rates were condemned as unreasonable, and the new ones approved as reasonable by the commission, action which is now, and was when these suits were begun, conclusive upon defendant.

Instead of publishing and collecting the rates fixed by the commission, defendant sought and obtained an injunction restraining the commission from putting into operation its said orders. The statute plainly recognizes the authority of a court of equity to so suspend the operation of the orders of the commission.

The case of the defendant is not, however, that of one prevented from doing something, pleading the prevention in excuse, or bar, of the consequences of its enforced nonaction. On the contrary, it is pleading its own action, pleading the injunction it sought for and secured upon representations held to be unfounded, as an excuse for retaining an exaction at all times *prima facie* unlawful, and, finally, in its own suit, conclusively determined to be unlawful. The temporary injunction permitted defendant, notwithstanding the orders of the commission, to continue to take what its published tariffs called for, but it is not apparent, and is not pointed out, how it legalized the exaction. See *Pacific Gas & Electric Co.* v. *San Francisco*, 211 Fed. 202; *Spring Valley Water Co.* v. *San Francisco*, 165 Fed. 667; *In re Arkansas Railroad Rates*, 168 Fed. 720; *Bellamy* v. *Railway Co.*, 220 Fed. 876 (136 C. C. A. 442) ; *State, ex rel. Barker*, v. *Railroad Co.*, 265 Mo. 646 (178 S. W. 129, L. R. A. 1916C, 309).

It will be perceived that the order of the commission fixes freight rates to apply when manufactured product is reshipped via defendant's line, and, when not so reshipped, the defendant is permitted to collect 50 cents per thousand feet additional, to be refunded, however, if shipper later ships out the manufactured product or some of it. Ambiguous the order in some respects is, but not, I think, in respect to the rate. The order made a rate of $1 a thousand for logs in car loads moving 10 miles or less, and varying rates as the distance was increased. To them defendant was permitted to add 50 cents a thousand, no matter what the length of haul, if the product was not shipped out by its line. Defendant could take nothing from these rates. What it did was to enforce its old tariff of $3 and $3.25 per thousand feet, which tariff contained the provision for a refund of 50 cents per thousand when an "equal amount of manufactured prod-

uct" was shipped out over its line. Defendant says that:

"The rebates offered by the railroad company and the provision to the same effect in the order of the railroad commission"

—are a plain violation of the act. If a rebate was intended, or was provided for, a discrimination in favor of particular shippers, no difference of opinion would exist. This provision was not questioned in the bill filed by the defendant. In my opinion, there is no rebate, no discrimination, provided for in the order. A uniform rate is established, and with it a milling in transit rate, not necessarily unlawful and not shown here to be unlawful. Watkins on Shippers and Carriers (2d Ed.), § 169; *In re Transportation of Wool, Hides, and Pelts,* 23 I. C. C. R. 151; *Transit Case,* 24 I. C. C. R. 340; *Laurel Cotton Mills* v. *Railroad Co.,* 84 Miss. 349 (37 South. 134, 66 L. R. A. 453). The statute, section 11 (2 Comp. Laws 1915, § 8119), reads:

"Nothing in this act shall be construed to prevent concentration, commodity, transit and other special contract rates, but all such rates shall be open to all shippers for a like kind of traffic under similar circumstances and conditions."    *    *    *

Defendant says, however, that to entitle any of the plaintiffs to the flat mileage rate fixed by the commission, they must have proved, not only that the manufactured product reshipped equaled the product of the logs shipped in by rail, but also that it was actually made from the logs shipped in by rail. This contention is not debated in the briefs for defendant. A reasonable interpretation of the language sustains the conclusion that tonnage generally, and not the tonnage of particular logs, was intended. In operation, the tariff, so interpreted, will not necessarily conflict with the law if the product shipped out is identical

with the product of logs which were actually shipped in, logs which moved into the transit point under the transit rate. We are required here to go no further than this. The subject generally has, however, had the attention of the interstate commerce commission, which, first adopting a governing rule, later abolished the same as inadequate, and thereafter treated each case as it arose. *In the Matter of the Investigation into the Substitution of Tonnage at Transit Points,* 26 I. C. C. R. 204. See *Sondheimer Co.* v. *Railroad Co.,* 20 I. C. C. R. 606; Watkins on Shippers and Carriers (2d Ed.), § 169. The conclusion of the trial court is not out of harmony with the views of the interstate commerce commission upon this point. I have not overlooked the North Carolina cases (*Hilton Lumber Co.* v. *Railroad Co.,* 136 N. C. 479 [48 S. E. 813]; *Hilton Lumber Co.* v. *Railroad Co.,* 141 N. C. 171 [53 S. E. 823, 6 L. R. A. (N. S.) 225]), cited by defendant, nor the claim of defendant that this court, in *Michigan Railroad Commission* v. *Railway Co.,* 185 Mich. 649, 653 (152 N. W. 193), held directly, or by implication, that the 50 cents differential here in question is not recoverable by plaintiffs as an excessive charge. I find nothing in these decisions to sustain any contention made here by defendant.

With the computations, upon which the verdicts and judgments are based, we have nothing to do, since counsel have agreed that, if the method followed is the correct one, the results of the computations are correct. The defendant's exceptions must be overruled.

What remains is the question of the right of the plaintiffs to have their damages, or any of them, doubled by the court. I shall not consider whether the statute provision for double damages is a provision for a penalty or for compensation. I am of opinion that it should not be applied in the cases at bar. The

carrier, the defendant, has neither done, nor permitted to be done, anything prohibited by the act, or by it declared to be unlawful, beyond this, that while questioning it has refused to put a tariff into operation, conduct approved by the court of chancery when it suspended by its process the operation of the orders of the commission. I have held that defendant may not profit by its said conduct, or by the said action of the court. And, on the other hand, what damages have been suffered by plaintiffs? Clearly, they are no other or different in kind than those suffered by any other shipper from whom the illegal charges were exacted. They have lost the use of money, of which defendant has had the use. Return of the sums exacted and interest is compensation. For this, the judgments, respectively, provide.

The judgments are affirmed. Neither party will recover costs of the appeal as against the others.

STONE, MOORE, STEERE, and BROOKE, JJ., concurred. KUHN, C. J., and BIRD and FELLOWS, JJ., did not sit.