GORHAM BROTHERS CO. *v.* ANN ARBOR RAILROAD CO.

1. CARRIERS—INTRASTATE SHIPMENTS—STATE RATES APPLICABLE.

Logs shipped over defendant railroad from a point in Michigan to another point therein, where they were to be converted into manufactured articles and reshipped to final destination over the same railroad, were intrastate rather than interstate shipments and therefore subject to State regulations on intrastate shipments, notwithstanding some of the manufactured articles might ultimately be shipped out of the State.[1]

2. SAME—RIGHT TO MAINTAIN ACTION FOR OVERCHARGE.

Where a railroad company overcharged a shipper on intrastate shipments, there was no administrative question involved requiring its submission to the public utilities commission as a prerequisite to maintaining an action therefor in the State courts; no question of reasonableness of rates being involved.[2]

3. SAME—MEASURE OF DAMAGE.

The charge in excess of the lowest intrastate rate between the shipping point and destination is the illegal excess, and each violation furnishes the measure of the shipper's damage therefor.[3]

4. SAME—ACTION IN STATE COURTS AUTHORIZED.

Under the Federal control act of 1918 (40 U. S. Stat. p. 456), an action in the State courts against the director general of railroads is authorized for overcharge in violation of State regulations fixing rates on intrastate shipments after he assumed control thereof.[4]

5. SAME — DOUBLE DAMAGES NOT WARRANTED IN ABSENCE OF MALICIOUS INTENTION.

In an action by a shipper against a railroad company to recover overcharges paid on intrastate shipments, plaintiff is entitled to recover actual damages only, in the absence of any showing of malicious purpose or intentional

[1]Commerce, 12 C. J. § 23; Carriers, 10 C. J. § 627; [2]Id., 10 C. J. § 716; [3]Id., 10 C. J. § 708; [4]Railroads, 33 Cyc. p. 45.

On recovery back of excessive payments to public service corporations, see note in 18 L. R. A. (N. S.) 124.

On validity of statute requiring claims for refund of overcharges by carriers to be submitted to public service commission, see note in 3 A. L. R. 203.

228—Mich.—18.

misconduct; double damages under such circumstances not being warranted.[5]

Error to Isabella; Hart (Ray), J.   Submitted January 25, 1924.   (Docket No. 151.)   Decided October 6 1924.

Assumpsit by Gorham Brothers Company against the Ann Arbor Railroad Company and another for excessive freight rates.   Judgment for plaintiff.·   Defendants bring error.   Affirmed, conditionally.

*Gustavus Ohlinger* and *F. H. Dusenbury* (*Alexander L. Smith*, of counsel), for appellants.

*Francis L. Williams*, for appellee.

STEERE, J.   During events involved here plaintiff was a Michigan corporation operating in this State with its headquarters and factory located in the city of Mt. Pleasant, where it engaged in manufacturing from logs wood panels and veneer, and selling its manufactured product.   In the course of its business it purchased logs and bolts at Cadillac and other places in this State, shipping the same from where purchased to its plant in Mt. Pleasant to be manufactured and from there shipped the finished product as sold to other places both within and without the State of Michigan.   The Ann Arbor Railroad Company is a corporation engaged as a common carrier in operating its railroad which lies principally in this State, extending from Toledo, Ohio, to the village of Frankfort òn Lake Michigan, passing through Mt. Pleasant and Cadillac.   On December 28, 1917, the director general of railroads under the Federal transportation act then in force took possession of the Ann Arbor Railroad Company's property and lines controlling and operating the same under the Federal law.   Prior to the

[5]Carriers, 10 C. J. § 708.

time it was taken over by the Federal authorities the
railroad company had published, posted and filed
various tariffs amongst which are specified the rates
to be applied on shipments of logs and other forest
products over its line between Cadillac and Mt.
Pleasant resulting, as plaintiff complains, in a higher
rate from Cadillac to Mt. Pleasant than from Mt.
Pleasant to Cadillac.   This action is brought to re-
cover the amounts claimed to have been exacted from
plaintiff in excess of legal rates.

During the period involved here and before the
line passed to Federal control plaintiff shipped from
Cadillac to Mt. Pleasant 1,888,399 feet of logs on 338
cars, for which it paid $4,286.95 transportation
charges.   During the period of Federal control it
shipped from Cadillac to Mt. Pleasant over this line
1,137,093 feet of logs on 185 cars, paying trans-
portation charges demanded therefor amounting to
$4,047.05.

From various schedules of tariffs of the Ann Arbor
Railroad Company which were introduced in evidence
the trial court and counsel extracted and condensed
into three tables the rates applying to the contention
involved, which do not seem to be questioned by either
party, and are stated in the findings of the court as
follows:

"From May 18, 1915, when the first shipment
specified in the declaration was made, to May 15, 1918,
rates on bolts and logs were in effect between Cadillac
and Mt. Pleasant as shown in the following table:

"TABLE 1.

"Direction, Cadillac to Mt. Pleasant and Mt.
Pleasant to Cadillac.   Rate, five cents per hundred
pounds.   Condition, no condition.

"Direction, Cadillac to Mt. Pleasant.   Rate, two and
one-tenth cents per hundred pounds.   Condition,
'Rates apply only on bolts and logs for manufacture,
the product whereof to be shipped by the Ann Arbor
Railroad.'

"Direction, Mt. Pleasant to Cadillac. Rate, one dollar and 57½ cents per thousand feet. Condition, 'Rates apply only on bolts and logs for manufacture, the product whereof to be shipped by the Ann Arbor Railroad.'

"During the period from May 15, 1918, to June 23, 1918, the rates were as follows:

"TABLE 2.

"Direction, Cadillac to Mt. Pleasant and Mt. Pleasant to Cadillac. Rate, six cents per hundred pounds. Condition, no condition.

"Direction, Cadillac to Mt. Pleasant. Rate three and one-tenth cents per hundred pounds. Condition, 'Rates apply only on bolts and logs for manufacture, the product whereof to be shipped by the Ann Arbor Railroad.'

"Direction, Mt. Pleasant to Cadillac. Rate, two dollars and 82½ cents per thousand feet. Condition, 'Rates apply only on bolts and logs for manufacture, the product whereof to be shipped by the Ann Arbor Railroad.'

"During the period from June 25, 1918, to the date of the last shipment specified in the declaration, namely, August 16, 1919, the following rates were in effect:

"TABLE 3.

"Direction, Cadillac to Mt. Pleasant and Mt. Pleasant to Cadillac. Rate seven and one-half cents per hundred pounds. Condition, no condition.

"Direction, Cadillac to Mt. Pleasant. Rate four cents per hundred feet. Condition, 'Rates apply only on bolts and logs for manufacture, the product whereof to be shipped by the Ann Arbor Railroad.'

"Direction, Mt. Pleasant to Cadillac. Rate three dollars and fifty cents per thousand feet. Condition, 'Rates apply only to bolts and logs for manufacture, the product whereof to be shipped by the Ann Arbor Railroad.' "

The main facts are practically undisputed. The case was tried before the court without a jury. Written requests for findings of fact and conclusions of law were tendered by both parties. Findings and conclusion were duly filed by the court. The court

held that the overcharges sought to be recovered were for intrastate transportation over which the State court had jurisdiction, and found that plaintiff had shipped over the line 338 car loads of logs and bolts from Cadillac to Mt. Pleasant prior to Federal control for which it had been charged and paid $1,326.26 in excess of the legal rate which, with interest of 5 per cent. to the time of judgment, amounted to $1,712.43, and doubling this under the statute for wilful violation of the law, rendered a judgment against the railroad company for $3,424.86.   For the period of Federal control, from January 16, 1918, to August 18, 1918, the court found plaintiff paid overcharges amounting to $812.19 on 185 car loads of logs and bolts transported for it over the line from Cadillac to Mt. Pleasant which with legal interest added amounted to $1,009.66, entering judgment therefor against James C. Davis in his official capacity, no claim being made for double damages.

The trial court in its findings further summarized the situation as to defendant's posted and published rates as follows:

"In short, I find that the defendant's published rates on logs from Cadillac to Mt. Pleasant prior to May 15, 1918, was 2.1 cents per hundred pounds; from May 15, 1918, to June 25, 1918, 3.1 cents per hundred pounds; from June 25, 1918, to and including August, 1919, 4c. per hundred pounds; that the published rate on logs from Mt. Pleasant to Cadillac was prior to May 15, 1918, 1.57½ per 1,000 feet; from May 15, 1918, to June 25, 1918, $2.82½ per 1,000 feet; from June 25, 1918, to and including August, 1919, $3.50 per 1,000 feet, and that a note was attached in each of said tariffs and applicable to all of such rates as follows, to wit:

" 'Rates apply only on bolts and logs for manufacture the product to be reshipped by the Ann Arbor Railroad Company.'

"That from and after May 15, 1918, the defendant published the following rule in the applicable tariffs,

which is taken from the Ann Arbor Tariff, GFD A-884, page 4:

"'Whenever a car load (or less than a car load) commodity rate is established, it removes the application of the class rate to or from the same point on that commodity in car load quantities (or less than car load quantities), as the case may be, except that same will not apply on Michigan intrastate traffic.'"

It is conceded by defendants' counsel that if the rates given in those tables for the reverse direction—from Mt. Pleasant to Cadillac—would apply to this transportation plaintiff should have paid on the 338 car loads $2,960.69 instead of $4,286.95, and for the 185 cars shipped during Federal control $3,243.86 instead of $4,047.05, making the overcharge exacted during the two periods respectively $1,326.26 and $812.19, as the trial court found.

Section 9 of Act No. 300, Pub. Acts 1909 (2 Comp. Laws 1915, § 8117), was in effect during the whole period of the transportation in question, and reads in part as follows:

"When there are two or more rates in effect between the same points, via the same route, the lowest published rate shall be the only legal rate applicable in this State. In the event a published through rate exceed any combination of two or more local rates between the same points within the State, the combination forming the lowest rate shall govern."

Referring to this provision of said act, the Michigan railroad commission, on May 15, 1913, adopted and promulgated its Tariff Ruling No. 15 as follows:

"When there are two or more rates in effect between the same points via the same route, the lowest published rate shall be the only legal rate applicable in this State.

"In the event a published through rate exceeds any combination of two or more rates between the same points within this State, the combination forming the lowest rate shall govern.

"This commission have this day ruled that the class rates or specific commodity rates between any two points within this State, where traffic moves entirely intrastate shall be the maximum basis for rates over the same route in the opposite direction, unless special permission be given by this commission to disregard such ruling."

No special permission is shown to have ever been given by the commission to disregard that ruling.

Plaintiff's contention is, in brief, that the statute quoted became a part of each tariff when published and filed as the law required which established the intrastate rates both ways between points in this State, in legal effect liquidating the overcharge and creating the liability for it, and the reshipping condition in the tariff tables that the "rates apply only on bolts and logs for manufacture, the products whereof to be shipped by the Ann Arbor Railroad" does not characterize the contemplated transportation as interstate commerce nor deprive the State courts of jurisdiction.

Defendants contend to the contrary, and urge primarily that under the facts shown shipments of the manufactured product were both intra- and interstate, as the tariff fairly anticipated, that in contemplation of law the commodity was in the course of transportation under a *transit rate* from Cadillac to its final destination of the manufactured or finished product which involved interstate commerce, and the State courts had no jurisdiction over either the defendant railroad, or defendant James C. Davis as agent designated by the president under provision of the transportation act of 1920, saying in general of the court's ruling:

"The trial court erred in failing to appreciate the true character of the rates involved; and his failure in this regard lies at the basis of most of the error committed by him and of which we complain."

Defendants' counsel in argument referred to transit rate as a legalized discrimination recognized by the statute of this State, citing section 8119, 2 Comp. Laws 1915, which provides:

"Nothing in this act shall be construed to prevent concentration, commodity, transit and other special contract rates, but all such rates shall be open to all shippers for a like kind of traffic under similar circumstances and conditions." * * *

Although the term "transit rate" appears to have acquired some recognized distinctive meaning in connection with transportation charges, the statute does not define it, and we do not discover that the law lexicographers have yet assumed to give a technical definition. Upon that subject, however, Mr. Bradley, traffic manager of the defendant railroad, testified that tariffs providing for reshipment such as those under consideration were technically known as a "transit arrangement," which was a "very technical subject, and one that gives a great deal of difficulty," but that "transit" had been defined by the interstate commerce commission as—

"suspended transportation by which part of the movement of freight is accomplished, and this property passes out of the possession of the carrier and into the possession of the owner, to be subsequently returned to the carrier for the continued transportation to the final destination. * * * The condition of that tariff rate is a further transportation."

Here the final destination was unnamed and unknown. If all the property was returned to the carrier for transportation to a final destination in this State the condition would be fully complied with and we would have under defendants' theory an absolute intrastate shipment transformed into an interstate shipment by the magic of definition.

In this case there was no continuous movement beyond Mt. Pleasant, where the logs were billed to from

Cadillac and where the shipment came to rest, was repossessed by its owner and stored in its yard there to remain for an indefinite period.   It was not intended to be transported elsewhere, either within or without this State, until at some indefinite future time its character, utility and value had been changed by its conversion in whole or in part into various manufactured articles without preservation of identity. Until a market was found the destination point and consignee were unknown.   Whether the shipment beyond Mt. Pleasant would be intra- or inter-state was unknown, one portion of a log or bolt might be shipped out of the State and another portion to a point within the State, according to what use was made of it as the finished articles were turned out.   The nearest available large cities were within the State.

In *Arkadelphia Milling Co.* v. *Railway Co.*, 249 U. S. 134-151 (39 Sup. Ct. 237), a similar question arose as to a movement of rough lumber from the woods to a milling point in the same State where it was manufactured into staves, headings and hoops.   When the rough material left the woods it was moved under a bill of lading issued from the woods to the milling point.   The process of drying and manufacturing occupied several months and the manufactured product was thereafter shipped to whoever purchased it.   The markets were mostly in other States.   It was the intention of the owners at the time they shipped the rough material to the milling point to manufacture it into the commodity stated, then sell and ship the same as soon as practicable.   They did not know to whom they would sell it or to what point it would be shipped, but did know there was little market for the manufactured articles in that State and expected they would sell and ship to points outside the State 95 per cent. of the finished product.   Of this the court said, speaking through Justice Pitney:

"Upon the facts as stated, it is our opinion that the district court erred in treating the movement of the rough lumber from the woods to the milling point as interstate commerce.     It is not merely that there was no continuous movement from the forest to the points without the State, but that when the rough material left the woods it was not intended that it should be transported out of the State, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its character, utility and value.     The raw material came to rest at the mill, and after the product was manufactured it remained stored there for an indefinite period—manufacture and storage occupying five months on the average—for the purpose of finding a market.     Where it would eventually be sold no one knew.     And the fact that previous experience indicated that 95 per cent. of it must be marketed outside of the State, so that this entered into the purpose of the parties when shipping the rough material to the mill, did not alter the character of the latter movement.     The question is too well settled by previous decisions to require discussion.     *Coe* v. *Errol*, 116 U. S. 517, 525 (6 Sup. Ct. 475) ; *Bacon* v. *Illinois*, 227 U. S. 504, 515, 516 (33 Sup. Ct. 299) ; *McCluskey* v. *Railway Co.*, 243 U. S. 36 (37 Sup. Ct. 374)."

The Federal interstate commerce commission expressed similar views recently in discussing a complaint of shippers that certain rates were unjust and unreasonable on sawlogs in car load lots, between points in Michigan on the Mackinaw division of the Michigan Central Railroad, including Bay City and Saginaw, when dependent for their applicability upon the volume of outbound movement over said railroad of the products manufactured from such logs (*Kneeland-Bigelow Co.* v. *Director General*, 85 I. C. C. Rep. 659—No. 12373.     Advance Sheet January 8, 1924).     The rates assailed grow out of old contracts between shippers and carriers incorporated in tariffs filed with the State railroad commission for the first time on January 1, 1908.     Effective April 15, 1918,

they were first filed with the Federal interstate commerce commission, effective May 15, 1918.   They bore a note reading "Rate applies on Michigan intrastate traffic only" and made subject to the condition that—

"78 cents per 1,000 feet or the equivalent in cases of rates named in items making reference to this note will be added unless 80 per cent. of the manufactured product taking the lumber rates or higher is shipped from the points named via the Michigan Central Railroad."

Noting that the rates assailed were limited by tariff provisions to Michigan intrastate traffic the interstate commerce commission stated as a further reason for dismissing the complaint as follows:

"The condition as to volume of outbound movement of the product attached to the inbound rates on logs, does not specify whether the final destination of the product shall be within or without the State of Michigan.   Some of the manufactured product has been shipped to interstate as well as to intrastate destinations.   However, this connecting up of the inbound and outbound movement is insufficient to give us jurisdiction over the inbound log rates assailed since Federal, control under the allegations of these complaints.   *   *   *   There is no segregation of the inbound logs by means of which it can be anticipated which will be manufactured into products moving to interstate destinations and which will be manufactured into products moving to intrastate destinations.   In fact, of the products manufactured from a given car of logs or even a given log some may move to interstate destinations and some to intrastate destinations. It will therefore be observed that there is no sufficiently manifest continuing intention to ship the product to interstate destinations attached to the inbound shipments of logs to consider that movement one of interstate commerce.   For these reasons we are without jurisdiction over any of the rates assailed subsequent to the period of Federal control."

The assembling of logs and bolts by plaintiff at its place of business in Mt. Pleasant was but a preliminary

gathering together of the raw material for use at its factory in the line of manufacture in which it was engaged. The condition that when the manufactured product should be shipped to market it would leave Mt. Pleasant over defendant's line to some then unascertained destination, which might be either within or without the State, did not change the character of the preliminary intrastate movement of the raw material to the factory. As said by Justice Bradley in *Coe v. Errol*, 116 U. S. 517 (6 Sup. Ct. 475), and quoted with approval by Chief Justice Taft in *Champlain Realty Co. v. Town of Brattleboro*, 260 U. S. 366 (43 Sup. Ct. 146):

"Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain."

There was no contract or condition that the manufactured product when "shipped by the Ann Arbor Railroad" should be transported out of the State.

We cannot agree with defendants' contention that this claimed overcharge involves an administrative question which should have been submitted to the commission as a prerequisite to seeking reparation in the courts. No question of reasonableness of rates is involved. Plaintiff's claim is one of straight overcharge, based on the rule of law which requires repayment of money exacted in violation of an express statutory provision. The charge in excess of the lowest intrastate rate between the two points is the illegal excess, and each violation furnishes the measure of the shipper's damage therefor. In *Robinson v. Marmon*, 157 Mich. 266, it is said:

"Under the Constitution the legislature has been vested with authority to fix freight rates, and, having exercised that authority, there is no call, as far as this case is concerned, to question the legislative judgment."

It is also contended as to the judgment against James C. Davis, that the Michigan laws and regulations do not apply to shipments after December 31, 1917, during Federal control, because the claim is in effect against the United States as a sovereignty, and the State court had no jurisdiction to adjudicate claims against the government unless so authorized by congress.   We are of opinion it was so authorized. The Federal control act of congress, passed in 1918 as a war measure, under which Federal control was later taken of this defendant railroad, provided:

"That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the president.   Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law."   40 U. S. Stat. p. 456.

The president was given large powers of proclamation under that act and by his proclamation of April 11, 1918, provided:-

"Until and except so far as said director general shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes of the United States and orders of the interstate commerce commission and to all statutes and orders of regulating commissions of the various States in which said systems or any part thereof may be situated.   But any orders, general or special, hereafter made by said director general, shall have paramount authority and be obeyed as such."   40 U. S. Stat. p. 1770.

Congress passed a transportation act (41 U. S. Stat. p. 456) on February 28, 1920, under which Davis was designated by the president as agent, providing in part as follows:

"SEC. 206 (a) Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the president of the railroad or system of transportation of any carrier (under provisions of the Federal control act, or of the act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the president for such purpose, which agent shall be designated by the president within thirty days after the passage of this act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this act, be brought in any court which but for Federal control would have had jurisdiction of the cause of action had it arisen against such carrier. * * *

"(f) The period of Federal control shall not be computed as a part of the periods of limitation in actions against carriers or in claims for reparation to the commission for causes of action arising prior to Federal control."

See, also, *Fahey* v. *Davis*, 224 Mich. 371.

The shipments involved here began May 18, 1915. Federal control of the line was taken over January 1, 1918, and terminated at midnight of February 29, 1920. This action was begun December 9, 1920.

Defendants also assigned and argued as error the award of double damages against the railroad company. Under the circumstances shown here we are of opinion that contention is well founded. These overcharges were made under somewhat uncertain and disturbed conditions resulting from the world war. So far as shown they were paid by plaintiff without protest or complaint at the time of payment and the record does not disclose, beyond the mere making of an overcharge, any malicious purpose or intentional misconduct on the part of the defendant demanding a special penalty. Plaintiff is only harmed by the over-

charge to the extent of the value of its use.   We con-
clude, as said in *Fletcher Paper Co.* v. *Railway Co.,*
198 Mich. 469, 496, when passing on a similar claim
for double damages:

"Clearly, they are no other or different in kind
than those suffered by any other shipper from whom
the illegal charges were exacted.   They have lost the
use of money, of which defendant has had the use.
Return of the sums exacted and interest is compen-
sation."

If plaintiff remits on its judgment to the actual
damages shown and awarded by the court it will stand
affirmed, without costs to either party except each shall
pay half the cost of printing the record; otherwise the
judgment must be reversed with costs to defendants
and a new trial granted.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE,
FELLOWS, and WIEST, JJ., concurred.