STATE OF NORTH CAROLINA Ex Rel. UTILITIES COMMISSION v.
THE MEAD CORPORATION.

(Filed 4 November, 1953.)

**1. Utilities Commission § 5—**

An appeal from the Utilities Commission must be determined upon the record as certified by the Commission, and the trial court has no authority to make additional findings of fact but may review the record only for error of law, and the findings of the Commission are conclusive unless they are not supported by competent, material and substantial evidence in view of the entire record. G.S. 62-26.10.

**2. Electricity § 3—**

A public service corporation must serve impartially customers receiving the same kind and degree of service regardless of whether they be competitors or not, and any difference in rates must be based upon substantial differences in service or conditions.

**3. Same: Utilities Commission § 5—**

The Utilities Commission concluded upon undisputed facts that there was no unlawful discrimination by a power company in the rates charged its commercial customers. *Held:* Whether the conclusion is supported by competent, material and substantial evidence in view of the entire record, presents a question of law for the decision of the court.

**4. Electricity § 3—**

A power company which is a subsidiary of one of its commercial customers may not give a preference to its parent corporation, but must give equal treatment to all its customers similarly situated, since having received the benefit of its charter privileges, including the power of eminent domain, it is chargeable with corresponding responsibilities in carrying on a business affected with a public interest.

**5. Same—**

A power company is not entitled to make differentials in rates between its customers based upon categories of service which have no substantial basis in fact, but may do so only upon classifications based on substantial difference in type or conditions of service.

**6. Same—Conclusion that difference in rates was based on real difference in type of service held not supported by evidence in this case.**

The undisputed facts were to the effect that a power company sold electricity to its parent corporation at approximately half the rate it charged its other commercial customers. It sought to justify the differential by asserting that the electricity sold its parent corporation was secondary power, while its other commercial customers were supplied primary or dependable power. The evidence further disclosed that the parent corporation purchased more than 80% of the electricity produced by the power company each year, and that the power company had constantly increased its plant capacity to furnish its parent corporation the power needed by it. *Held:* There was no evidence legally sufficient to support the conclusion

of the Utilities Commission that there was no unjust discrimination between the commercial customers of the power company, or justifying its order authorizing an increase in rates charged all commercial customers of the power company except its parent corporation, it being apparent that the designation of the electricity as primary and secondary power was a mere label applied to essentially the same service.

BARNHILL, J., concurring.

APPEAL by Nantahala Power & Light Co. from *Gwyn, J.,* JACKSON Superior Court, 29 June, 1953. Modified and affirmed.

This proceeding was instituted before the North Carolina Utilities Commission by the Nantahala Power & Light Co. by filing application for authority to cancel stated obsolete schedules to make certain service charges, and to increase the rates for electric power to industrial customers, alleging that rates now on file do not afford applicant adequate return on its investment.

To this application for authority to increase rates for electric current furnished industrial customers the Mead Corporation filed protest.

The Nantahala Power & Light Co. (hereinafter referred to as Nantahala) is a North Carolina public service corporation engaged in the business of generating, transmitting, distributing and selling electric power and energy in Western North Carolina. Its electric power is obtained from a number of dams located on mountain streams in the extreme western part of the State and has a rated installed capacity of 80,000 KW. It furnishes electric service to the people of six or seven counties and electric power for industrial purposes.

The Mead Corporation (hereinafter referred to as Mead) is an Ohio corporation domesticated in North Carolina and is engaged in the business of manufacturing pulp and paper at Sylva, North Carolina. It obtains its electric power for its industry from Nantahala.

The rate increase applied for by Nantahala would affect 16 industrial customers, and would increase the electric charge for Mead by the sum of $24,131.95 a year.

The stock of the Nantahala corporation is wholly owned by the Aluminum Corporation of America (hereinafter referred to as Alcoa) which is engaged in the production of aluminum, using electric power with plants in Tennessee. During the twelve months ended 30 June, 1952, Alcoa received from Nantahala 309,194,761 KWH, which constituted 81.65% of the total KWH sales made by Nantahala for which Alcoa paid at the rate of 2.3 mills per KWH, amounting to $711,147.95. This amount was 47.3% of Nantahala's total revenue from sales of electric energy for that period. So that 52.7% of Nantahala's revenue was paid for by those using 18.35% of its electric power. The rate charged Alcoa would not be affected by the proposed increase.

The Utilities Commission heard the evidence of the witnesses offered by applicant and protestant, and considered the exhibits filed. The Commission, through Commissioner Hunter, stated the question presented as follows: "Whether such an arrangement between Alcoa and its subsidiary, the applicant herein, amounts to a preference and an unlawful discrimination in favor of said parent company and to the prejudice of the other customers of the applicant is the principal question presented in this case."

The Commission summarized the facts shown by the testimony as follows:

"1. The Nantahala Power & Light Company, applicant herein, is a wholly-owned subsidiary of the Aluminum Company of America. Said applicant is a North Carolina corporation which was organized and began business in 1929 and has increased its generating plants, all of which are hydroelectric, from one plant in 1929 with a capacity of 1,400 KW to eight plants at present with a total capacity of 79,435 KW, and has increased its customers from 238 when it began business to 10,000 at present. All of its customers other than Alcoa are located in the extreme western portion of North Carolina in the counties of Cherokee, Clay, Graham, Jackson, Macon, and Swain. Alcoa is located in Tennessee.

"2. Approximately 8,000 of the 10,000 customers served by applicant are in the rural areas. It now serves 95% of the population in its service area and is extending its rural distribution lines at the rate of approximately 135 miles annually. The territory it serves is not only predominantly rural and sparsely populated with no large towns and with few industries, but is a very rugged mountain area in which construction and operating costs are high. It has in this area an interconnected transmission system of approximately 151 miles, a distribution system of 1,160 miles of lines, and for the twelve months ending June 30, 1952, had an average net investment of $17,002,764.46, which includes the usual allowance for working capital. Its income for return on said investment is now negative to the extent of $41,701, and with the proposed increase in rates its rate of return on said investment will still be negative, or in the red, to the extent of $26,856. It has reduced its rates many times since it began business in 1929, but has never requested or received an increase in rates and has never paid a dividend on its common stock. It has no preferred stock and no bonded indebtedness.

"3. Said sum of $17,002,764.46 has been advanced by Alcoa from time to time as the applicant's needs require, but Alcoa receives no consideration for its said investment in the applicant's electric plant other than the privilege and obligation of purchasing such power as the applicant has left over after serving its other customers. Under the present arrangement between said parties Alcoa pays for such left over or secondary

power two mills per KWH at the bus bar and pays the applicant an additional transmission rental charge of .3 of one mill per KWH, or a total of 2.3 mills per KWH. All line losses are borne by Alcoa.

"4. The price paid by Alcoa is just about cost. Applicant's production cost per KWH, including production plant depreciation, all operating expenses of the production plant, and the *ad valorem* taxes on the production plant, is 1.56 mills per KWH. Other expenses which may be fairly and properly allocated to Alcoa bring the cost of power purchased by it during the twelve months' period ending June 30, 1952, to 2.2 mills per KWH, or 1/10 of one mill per KWH less than the price paid by Alcoa.

"5. During World War II, applicant was required by the Federal Government to deliver all available power to Alcoa to the exclusion of some of its other customers. This was considered to be primary power and the price to Alcoa was 6.46 mills, or about 1.4 mills higher than the present price to The Mead Corporation. Since the war, applicant has sold to Alcoa only secondary power, or only such power as it has left after serving its other customers. The availability of such power in any desired quantity is uncertain and for that reason its price is low as compared with primary power. During the past year T.V.A. has sold secondary power to Alcoa as low as one mill per KWH.

"6. Should Alcoa receive credit on its power purchases from the applicant, an amount equal to 6% on its investment of $17,002,764.46 in said applicant company, Alcoa would have paid for secondary power the equivalent of 5.599 mills per KWH for the 309,194,760 KWH purchased during the twelve months' period ending June 30, 1952, as compared with 5.09 mills per KWH by The Mead Corporation for primary power and 5.98 mills per KWH which said corporation would have paid if the proposed rates had been in effect during said twelve months' period. It is also in evidence that Alcoa through the years has furnished and continues to furnish to the applicant engineering service and other technical services at less than cost at which the same may be obtained elsewhere and at much less than its value to applicant."

From the facts so found the Commission entered its conclusions and order as follows:

"A public utility is under a legal duty to serve all its customers alike without favor, preference or discrimination. A parent company which is also a customer stands in the same position as any other customer. It is entitled to no preferential treatment in either rates or service. Regulatory commissions and the courts have uniformly so held. *Re Aptos Water Co.* (Col.), P. U. R. 1929 C. 557; *Public Utilities Commission v. East Providence Water Co.* (R. I.), 136 Atl. 447; *City of Charleston v. Public Service Commission* (W. Va.), 120 S.E. 398; *Re Derby Gas & Electric*

*Co.* (Conn.), 75 P. U. R. (NS) 114. But a parent company is entitled to every consideration in rates and services given to other customers. That Alcoa is a large corporation with far-reaching connections and interests that enable it to take all the surplus power generated by the applicant, regardless of quantity and whenever available, should not operate to its prejudice or disadvantage. It is most improbable that any industrial customer other than Alcoa would be willing to obligate itself to purchase secondary power only at any price.

"Applying the well established and well recognized principle of equity and impartiality between customers to the facts in this case, we find no reason to condemn the arrangement between the applicant and Alcoa by which Alcoa obligates itself to purchase at 2.3 mills per KWH all power generated by the applicant in excess of the requirements of its other customers. Such an arrangement inures to the benefit of other customers for the reason that it obviates the necessity and expense of stand-by plants to meet the requirements during years or periods of water deficiency.

"The testimony does not disclose any discrimination in favor of Alcoa or that the other customers of the applicant are adversely affected by the relationship or course of dealing between Alcoa and the applicant. Their public utility operations do not follow conventional lines in that said public utility business is operated on a cost or no return basis, but to the advantage of all utility customers. Perhaps the purpose of requesting an increase in rates which will still produce insufficient revenue to yield a return on the investment is to effect a saving in taxes, but whatever the purpose, the effect is lower rates to all customers and the development of that part of Western North Carolina in which said public utility operates. No other section of the State is so favored with cheap dependable power available to such a large portion of the rural population.

"The Mead Corporation is in no position to complain about its power rates. It is understandable that it does not welcome a proposal to increase its power bill to the extent of approximately $2,000 per month, but its rates when measured by any accepted standard are low and with the proposed increase its rates will still be low. In its brief it makes certain comparisons between applicant's rates and the rates of other electric power companies. Companies operate under such different conditions that comparisons have very little value for rate-making purposes, but in comparing rates for such information as such a study reveals we find no industrial plant in North Carolina which now purchases as many kilowatt-hours of primary power for as little money as does The Mead Corporation. With the proposed increase in rates it will still be in a position to purchase more power from the applicant for less money than it could under any existing schedule from any other power company operating in North Carolina.

"It is in no position to complain about its rates as compared with the rates to Alcoa. It purchases primary power; Alcoa purchases only secondary power. It does not pay for line losses; Alcoa does. It does not have any investment in the applicant company; Alcoa has an investment in said company of approximately $17,000,000 on which it receives no return, in dividends, or otherwise. Considering its investment on which it has a right to earn a fair and reasonable return, it is paying indirectly but paying nonetheless a higher price for secondary power than The Mead Corporation pays for primary power, and with the proposed increase in rates it will still pay about the same price for secondary power that The Mead Corporation will pay for primary power.

"There is some question as to whether this Commission or the Federal Power Commission has jurisdiction over rates for power transmitted to Alcoa in Tennessee, but in any view of the facts of this case we are unable to find any unlawful discrimination against the North Carolina customers of the applicant or any just reason for denying the application for the proposed increase in rates.

"IT IS, THEREFORE, ORDERED that the Nantahala Power and Light Company be, and it is hereby authorized (a) to cancel Schedules A and F, (b) to make a charge of $2.00 plus 15c per mile traveled in reconnecting meters which have been removed and reinstalled within a period of twelve months, and (c) to publish and put into effect Schedule "PL" as set out in Exhibit A hereto attached, said rates and charges to apply on all bills rendered by the applicant from and after the 15th day of December 1952."

To the findings and order of the Utilities Commission The Mead Corporation filed petition to rehear. This was denied and Mead Corporation appealed to the Superior Court.

In the Superior Court Judge Gwyn, after considering the entire record and analyzing the evidence and the findings of the Commission, entered judgment as follows:

"The Nantahala Power and Light Company applied for authority to raise its rates on primary power on the ground that it is being required to sell its output of electrical energy at less than cost of production.

"Mr. John M. Archer, President of the petitioner, isolated the trouble in this case when he pointed out the necessity of holding in mind the difference between primary power and secondary power, the difference in the rate and the reason for the difference.

"During the year ending June 30, 1952, the petitioner generated and sold 378,557,840 kilowatt hours of electrical energy. Of the total output, 81.65%, or 309,194,760 kilowatt hours was purchased by the parent corporation, the Aluminum Company of America. The remaining 18.35% was purchased by other users. The Utilities Commission finds that the

Aluminum Company of America purchased only secondary power, whereas other users purchased primary power. The price received for secondary power was 2.3 mills per kilowatt-hour; the price for primary power was higher, The Mead Company paying 5.09 per kilowatt-hour.

"The crucial question is: What is primary power and what is secondary power? President Archer gave a clear-cut distinction between the two, which seems to be altogether reasonable. He testified that primary power is dependable power, and conversely, that secondary power is undependable. To use his language, 'Secondary power, yes, sir, that's something you can't depend on to operate a manufacturing plant.' Again, he testified: 'The parent corporation gets only secondary power and the industrial users are using prime power. That should be kept in mind. That is the difference in the rate, the reason for it.'

"It is therefore clear that secondary power must be sold at a lower rate than primary power. It is less valuable than primary power. It is available when the rivers are full, but it is uncertain. It is a surplus, a fluctuating excess. It is not certain to the extent that the producer is warranted in guaranteeing its delivery. In short, as President Archer puts it, it is 'undependable.' Primary power, on the other hand, is constant and regular. Its certainty is such that the producer is warranted in guaranteeing its delivery. It is 'dependable.' Because of its certainty and dependability it is more valuable than secondary power. It is sold at a higher price. The next question is: What part of the petitioner's output of electrical energy is primary power and what part secondary; what part is dependable and what part undependable? It is not given to any person to know in advance the exact line of division. However, experience over cycles of years affords a reasonable approach to what may be regarded as dependable and what undependable. President Archer gave a sort of 'rule of thumb,' which appears to have been a safe guide. Talking about regular production 'around the clock,' he testified: 'You install 100,000 kilowatts of hydro, you may expect to get 50,000 kilowatts capacity.' He testified further: 'We have a capacity, installed capacity, in generating stations today, something in excess of 80,000 kilowatts, based on the amount of generation to the twelve-month period ending June 30, 1952. That capacity amounts to slightly over 40,000 kilowatts; that is controlled, of course, by the amount of water we have in the rivers.' It would seem to be proper to correct a slight inaccuracy as to total capacity by quoting the President's earlier testimony when he said: 'At the moment, we have eight hydroelectric plants, in contrast to the application which said seven; we've put one plant in service in the last two weeks; total capacity of 79,435 kilowatts.' So, it appears that the production of 'slightly over 40,000 kilowatts' for the year ending June 30, 1952, was accomplished not with eight plants having a total capacity of 79,435

kilowatt-hours, but with seven plants. That year, it must be noted, was one of the very dry years. If, therefore, during one of the severest years in modern times the petitioner was able to produce hydroelectric power in excess of fifty per cent of its capacity, the validity of the rule of fifty per cent, as given by President Archer, would seem to be established. By all the rules and reason by which people in this field seek to ascertain reasonable certainty, it would seem that 50% of normal capacity could be safely counted upon. If that is true, and if we follow the rule suggested by the petitioner, through its President, 50% is primary power. The experience of the past is the proof. There is no evidence of record in this cause which is inconsistent with this conclusion.

"If, for the purpose of production, a rule may be adduced to determine the amount of dependable power which may be generated, it would seem that the same rule should be considered in selling the power produced. This the petitioner has not done. According to the label given it, the petitioner sells to the parent company, the Aluminum Company of America, only secondary or undependable power. The Utilities Commission seems to have accepted the label as importing verity without exploring the evidence to ascertain whether the label is true or false. It is the opinion of this Court that the label is false.

"For the purpose of selling its electrical output, the petitioner appears to have disregarded the rule of dependability in determining its value. The nearest approach to a 'selling rule' which the petitioner seems to have followed is that all power sold to the parent company must be regarded as secondary or undependable power and that only power sold to other users may be regarded as primary or dependable power. Until 1946 the petitioner sold primary power to the parent company. Since 1946 it has sold to the parent company only secondary power. For the year ending June 30, 1951, the parent company purchased 84% of the petitioner's total output as secondary power. Only the remainder, 16%, was sold as primary power. For the year ending June 30, 1950, the parent company purchased 89% as secondary power. The remainder, 11%, was sold as primary power. For the year ending June 30, 1949, the parent company purchased 90% as secondary power. The remainder, 10%, was sold as primary power. For the year ending June 30, 1948, the parent company purchased 89% as secondary power. The remainder, 11%, was sold as primary power. For the year ending June 30, 1947, the parent company purchased 92% of the petitioner's total production as secondary or undependable power. The remainder, 8%, was sold to other users as dependable or primary power. Thus, for the purpose of sale, the rule of dependability was disregarded and an altogether arbitrary rule followed. That rule seems to be that secondary or undependable power shall be co-extensive with the demands and purchases of the parent

company. By disregarding the rule of dependability, and by following the rule which the petitioner apparently has invoked, a much higher percentage of the petitioner's production could be regarded as secondary or undependable power, 95% or 96%, or 98%, or 99% plus could be so regarded, as was freely admitted by counsel representing the State on the oral argument. Thus the fallacy is manifest. The rule, if any, reduces itself to an absurdity.

"The rule to determine dependability must fix the point of dependability somewhere between Zero and 100% of normal capacity of production. That point, for practical purposes, would seem to be where the President placed it—50% of normal capacity production. If in one of the worst years for hydroelectric production only 18.35% was regarded as dependable power, then the petitioner has not had the right regard for the power it produced. By no known rule or stretch of the imagination could 81.65% of its production in such a year be considered or rightly called secondary or undependable. There is at least 31.65%, or the difference between 50% and 81.65%, which has been falsely named and falsely dealt with. Calling it secondary does not make it so. Giving it the wrong label does not conjure away the reality, and no amount of judicial legerdemain can change its true character and make undependable that which is in fact dependable. To raise the rates for those who use only 18.35% labeled as primary power and to allow the bulk, 81.65%, to be taken by the parent corporation at cost, or less, is like requiring too small a tail to wag too big a dog.

"This Court would join with the Utilities Commission and all others in their appreciation of the part the petitioner has taken in the development of Western North Carolina. The fact that its rates for primary power are lower than those of some other power companies is an advantage to the users. But that is not the test to determine whether there is discrimination. As stated in the order of the Commission, a public utility is under a legal duty to serve all its customers alike without favor, preference or discrimination. A parent company which is also a customer stands in the same position as any other customer. It is entitled to every consideration in rates and services given to other customers, but it is entitled to no preferential treatment in either rates or services.

"It is difficult to see how the relationship between the petitioner and its parent company squares with the law which governs that relationship. For 24 years the petitioner has engaged in the production of hydroelectric power. The President states that the Company is engaged in such business for profit. It has never earned a profit. Each fiscal year finds it consistently in the red. The Commission finds that the parent company owns all the stock in the petitioner; that its investment in the petitioner is approximately $17,000,000, on which it receives no returns, in divi-

dends or otherwise. Furthermore, the parent company furnishes valuable services annually to the petitioner for only nominal charges. The petitioner does not ask for an increase in rates sufficient to make a profit; in fact, it asks for such an increase as will insure a calculated loss. That loss, according to the petitioner, will be $26,856.00. The mystery deepens when it is considered that the petitioner regards 81.65% of its production (during a dry year) surplus or 'left over' power, and at the same time the parent company prepares to increase production by the construction of other plants.

"The petitioner is entitled to earn profits and the parent company is entitled to receive a fair return upon its investment. Public welfare demands it. Without profits private capital would cease to find its way into public utilities and the government would have to take over. The profit notion is the central idea of our free, competitive system. Therein lies the secret of efficiency, good business, the maximum flow of physical and intellectual energy, and our abundant life.

"It is embarrassingly obvious, upon this record, that the petitioner is operating not at a loss but at a profit which it has been able to conceal. Its service to the public is a valuable service and warrants the issuance of the State's Certificate of Convenience and Necessity and the exercise of the power of Eminent Domain, but its primary purpose seems to be to serve its parent company with primary power labeled as secondary. It has sold tremendous amounts of such power to the parent Company in the past. The prices charged the parent company have been consistently reduced from year to year, notwithstanding a consistent rise in cost of production. When the amount of power which the petitioner transmits to the parent company is threatened to be decreased by an increase of public users, the threat is promptly met by the establishment of other plants. The dry-year surplus, of 81.65% was produced by seven plants. Within less than a year the eighth plant went into operation. Two other plants are on their way. For what purpose? Could it be to make the 18.35 dependable? . . .

"To allow the order of the Utilities Commission would be to allow discrimination. This Court is of the opinion that the record in its entirety is susceptible to no other interpretation. For the reasons set forth,

"IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED that the order of the Utilities Commission allowing the increase in rates be reversed. It is further ordered that the petitioner, Nantahala Power & Light Company, pay the costs of this appeal."

To this judgment the court later added the following sentence which had been omitted: "The record contains no evidence legally sufficient to support the interpretation given it by the Utilities Commission."

From the judgment reversing the order of the Utilities Commission the Nantahala Power & Light Co. appealed. The Utilities Commission did not appeal.

*Jones & Jones and Joyner & Howison for Nantahala Power & Light Company, appellant.*

*John R. Jordan, Jr., Blanchard & Jordan, David M. Hall, Boyd Compton, and Smith, Schnacke & Compton for Mead Corporation, appellee.*

DEVIN, C. J. This proceeding was instituted by the application of the Nantahala Power & Light Company to the Utilities Commission for authority to increase its rates for electric power distributed to customers for industrial purposes. Consequent upon an order by the Commission authorizing the increase and later denying the petition of Mead Corporation to rehear, the matter came on to be heard, on appeal, by the Judge of the Superior Court. From an adverse judgment in the Superior Court the appellant, the Nantahala Power & Light Company, brings the case here for review.

The statute governing procedure before the Utilities Commission prescribes the rules and extent of review on appeal from an order of the Commission. G.S. 62-26.10. This statute provides that on such appeal to the Superior Court the review shall be on the record certified by the Commission, and the cause heard by the judge without a jury who may reverse or modify the decision of the Commission if substantial rights have been prejudiced because of findings and conclusions which are "unsupported by competent, material and substantial evidence in view of the entire record submitted." *Utilities Com. v. R. R.,* 235 N.C. 273, 69 S.E. 2d 502; *Utilities Com. v. Fox,* 236 N.C. 553, 73 S.E. 2d 464. The statute further provides that upon appeal to the Superior Court the finding, determination or order of the Commission shall be *"prima facie* just and reasonable." G.S. 62-26.10. Appeals from the Utilities Commission are confined to questions of law, and on appeal the appellant may not rely upon grounds for relief which were not set forth in his petition for rehearing by the Commission. *Utilities Com. v. Coach Co.,* 233 N.C. 119, 63 S.E. 2d 113. There is no provision for additional findings of fact by the judge for the purpose of determining the validity of the order of the Commission brought in question. *Utilities Com. v. Fox, supra.*

At the outset in the statement of findings and conclusions by the Utilities Commission it was stated that the principal question presented was "whether the arrangement between Alcoa and its subsidiary, Nantahala Power Company, amounts to a preference and an unlawful discrimination in favor of the parent company and to the prejudice of the other customers of the applicant."

The statute G.S. 62-70 prohibits discrimination by a public service corporation in the following language: "No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or person or subject any corporation or person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service. The Commission may determine any questions of fact arising under this section."

The obligation of a public service corporation to serve impartially and without unjust discrimination is fundamental. *Lumber Co. v. R. R.,* 136 N.C. 479, 48 S.E. 813; *Garrison v. R. R.,* 150 N.C. 575, 64 S.E. 578; *Public Service Co. v. Power Co.,* 179 N.C. 18, 101 S.E. 593; *R. R. v. Power Co.,* 180 N.C. 422, 105 S.E. 28. It is not essential that consumers who are charged different rates for service should be competitors in order to invoke this principle. *Texas Power & Light Co. v. Doering Hotel Co.,* 147 S.W. 2d 879. There must be substantial differences in service or conditions to justify difference in rates. There must be no unreasonable discrimination between those receiving the same kind and degree of service. *Horner v. Electric Co.,* 153 N.C. 535, 69 S.E. 607; *Postal Tel-Cable Co. v. Associated Press,* 228 N.Y. 370.

The protestant, the Mead Corporation, does not directly attack the action of the Commission in authorizing the rate increase applied for as being in itself arbitrary, unreasonable or unjust, but it does contend that the whole question of rates is bound up in the basic and determinative question of the admitted substantial difference in the rates proposed to be charged the Mead Corporation, an industrial customer, and those for which Alcoa, also an industrial customer, is now and will continue to be charged, and that the order of the Commission would result in unreasonable discrimination and subject the Mead Corporation to an unreasonable disadvantage.

The position of the Nantahala Company is that the proposed increase in rates would still leave Mead in the position of paying a less rate than that charged by other power companies in other sections; that the difference in rates does not under the facts of this case constitute an unreasonable preference or discrimination, and that the Mead Corporation is not subjected to any unreasonable prejudice or disadvantage. It is contended that the difference in rates is reasonably based upon the distinction between primary and secondary power, the protestant having primary or dependable power, and Alcoa taking only what is left over or "dumped" upon it; and that there is a difference in the service afforded users of primary power and that received by users of secondary power; that line losses are borne by Alcoa and not by Mead; that Nantahala is entitled to a reasonable return on its investment of some seventeen million dollars,

and that with the increase in rates it would still be unable to earn a profit; that Nantahala and Alcoa were not competitors, and that the rates proposed apply to different classes of service.

Judge Gwyn studied the evidence and the findings of the Commission, and set out his conclusions thereon and the reasons therefor at length. He concluded that "the record contained no evidence legally sufficient to support the interpretation given it by the Utilities Commission"; that the record was susceptible to no other interpretation but that the order of the Commission would allow discrimination. He held that the record evidence did not support the finding that the difference in rates to two industrial users of electric power could be attributable to an arbitrary designation of one as primary and the other as secondary.

The facts are not in dispute. Upon them the Utilities Commission decided that "in any view of the facts of this case we are unable to find any unlawful discrimination against the North Carolina customers of the applicant (Nantahala), or any just reason for denying the application for the proposed increase in rates."

The judge held, however, that the record contained no evidence legally sufficient to support this interpretation, and upon that ground reversed the order of the Commission. Whether the findings and conclusions of the Utilities Commission were "unsupported by competent, material and substantial evidence in view of the entire record" presented a question of law for the decision of the Court. 42 A.J. 635. In that view Judge Gwyn held as a matter of law that the record was susceptible of no other interpretation but that the order of the Commission would allow an unreasonable discrimination, and that the rate increase based upon and concomitant with such discrimination was improvidently authorized. From an examination of the record we are inclined to the view that the ruling of the court below in principle should be upheld.

Here, according to the record, Alcoa owns all the capital stock of Nantahala which represents an investment of seventeen million dollars in hydroelectric plants in Western North Carolina. Presumably Alcoa furnished the capital for this enterprise. Alcoa uses electric power in enormous volume for the production of aluminum. It takes 81.65% of Nantahala's total generation of electric power for which it pays less than the cost of producing and distributing it. It derives no dividend or income from its ownership of Nantahala stock. Nantahala has other customers, including Mead, who are charged a higher rate and from whom it derives the major portion of its income. Nantahala has continued to expand its production through the years by adding to the number of its hydroelectric plants, but the percentage of resultant electric energy devoted to Alcoa has remained fairly constant. The more Nantahala expands the greater the volume of electric current Alcoa obtains at 2.3

mills per kilowatt hour. And Nantahala continues to derive the greater part of its revenue from customers other than Alcoa who consume only 18.35% of its power and are charged approximately twice as much per kilowatt hour as Alcoa pays.

The increase in rates applied for by Nantahala applies only to the industrial customers other than Alcoa. No increase in Alcoa's rate is contemplated. Among the reasons for presently asking authority to increase rates is that it will provide more revenue and enable Nantahala to put to use additional hydroelectric plants. The burden of rate increase is placed upon one particular group of customers.

Since Alcoa owns the entire stock of Nantahala ordinarily their dealings between themselves would be a matter of bookkeeping. But Nantahala is a separate legal entity, a corporation created under the laws of North Carolina and endowed with the powers, duties and obligations set forth in its charter, and as a corporation engaged in the production and distribution to the public of an essential utility it must be amenable to and required to observe all the laws and regulations prescribed for public service corporations, including the statutory prohibition against unreasonable discrimination among users of its service. Notwithstanding Alcoa is the parent corporation and Nantahala the subsidiary, when the dealings between them affect the rights of others, it cannot by unreasonable discrimination differentiate between customers entitled to the same kind and degree of service. *Public Service Co. v. Power Co., supra.* Having received the benefit of its chartered privileges, including the power of eminent domain, Nantahala must be chargeable with corresponding responsibilities in a business affected with a public interest. *Griffin v. Water Co.*, 122 N.C. 206, 30 S.E. 319. It was also in evidence from the director of accounting of the Utilities Commission that considering only the revenue afforded by customers using 18.35% of total energy, in relation to that proportion of capitalization and expense, it would show a return of 6.52%, whereas the service to all customers, including Alcoa at the rate paid, would show receipts less than operating expense. So it would seem the rate increase applied for would also increase the discriminations between Mead and Alcoa.

While the investment of Alcoa in hydroelectric plants and in the generation of electric energy from the flowing streams of Western North Carolina is to be commended, we do not think it is entitled to a return on its investment in Nantahala in the form of a preferential rate to the extent it would work to the disadvantage of other users of its electric service. 73 C.J.S. 1049. Nor is a parent corporation entitled to preference from its subsidiary. *Utilities Com. v. Water Co.*, 136 Atl. 447. There must be equal treatment of all customers of utilities similarly situated. *Columbia Baking Co. v. Atlanta Gas Light Co.*, 78 Ga. App. 241,

50 S.E. 2d 382. Both Alcoa and Mead are users of electric power for industrial purposes, the one to produce aluminum, the other, paper. But the rates proposed to be charged for this power as to Mead is double that charged to Alcoa.

Notwithstanding the evidence and the findings of the Utilities Commission showed that Alcoa was charged a rate for electric power less than half that charged Mead, the Commission concluded it was unable to find any unreasonable discrimination, and based this conclusion upon acceptance of the theory of primary and secondary power as contended by Nantahala. We agree with the judge below that the question of whether the power distributed to Alcoa was secondary power, and that to Mead primary, was to a large extent the mere application of different labels to that which is essentially the same. True, there was some difference in the service and in the expense of transmission, and to some extent the electric power received by Alcoa was what was denominated undependable, but these were in no way comparable to the difference in rates which was so glaring as to compel the inference that it was unreasonable and therefore unlawful. Rates may be fixed in view of dissimilarities in conditions of service, but there must be some reasonable proportion between the variance in the conditions and the variances in the charges. *Postal Tel-Cable Co. v. Associated Press,* 228 N.Y. 370. Classification must be based on substantial difference. *Laundry, Inc., v. Pub. Serv. Com.,* 327 Mo. 93.

The judgment of Judge Gwyn determined from the entire record including the findings and conclusions of the Utilities Commission that there was no substantial evidence to support the finding of the Commission that the applicant, the Nantahala Power & Light Company, sold to its parent corporation, Alcoa, only "secondary power"; that there was no evidence legally sufficient to support the finding "that the Utilities Commission was unable to find therefrom (the entire record) any unjust discrimination," and that the order of the Utilities Commission, based on findings without support in the evidence, authorizing an increase in rates by Nantahala for all users of electric power for industrial purposes except Alcoa, would be to allow unreasonable discrimination, and was erroneously entered.

To this extent the judgment below is affirmed, and the cause is remanded to the Superior Court of Macon County, to the end that it be remanded to the Utilities Commission for such findings and orders in the premises as may be proper, not inconsistent with this opinion.

Modified and affirmed.

BARNHILL, J., concurring: While I concur fully in the majority opinion, there are certain facts appearing of record to which I wish to

direct particular attention. The petitioner, a wholly owned subsidiary of Alcoa, began business as a public utility or *quasi*-public corporation in 1929. It then had one plant with a capacity of 1400 KWH. When the petition herein was filed it had increased its plants to seven with a capacity of 79,435 KWH—56.7 times greater than at the beginning. One plant has been put in operation since this proceeding was instituted. Two other plants are now in process of construction. This has been accomplished without increasing its capital stock or incurring any bonded indebtedness. The parent company has furnished the necessary funds.

Petitioner's fiscal year ends on June 30. During the fiscal year 1947 it delivered 92% of its total output to Alcoa, in 1948, 89%, in 1949, 90%, in 1950, 89%, in 1951, 84%, and in 1952, 81.35%. Mead paid 5.09 mills per KWH for the power it consumed, and Alcoa paid 2.3 mills which was approximately the cost of production. "The price paid by Alcoa is just about cost."

In 1952 Alcoa, which received 81.35% of petitioner's total production of power, paid only 47.3% of petitioner's total revenue while those who purchased only 18.65% paid 52.7% thereof.

Thus it appears that petitioner has sold to local consumers a minimum of 8% and a maximum of 18.65% of its total production during the past seven years. Why then this constant increase in productive capacity? The answer is self-evident.

In view of these and other facts appearing in the record, to assert that the electric power retailed to North Carolina customers constitutes all the primary power produced by petitioner and the total amount delivered to Alcoa is secondary power so as to justify the present and proposed discriminations in rates in favor of Alcoa, or to contend that this is a proper basis for the decided differential in rates serves only to challenge the intelligence of the Court.

But Alcoa is under contract to purchase all the secondary power produced by petitioner. By reason thereof, Alcoa is compelled at times to accept and pay for electric current it cannot use. So it is argued. I have no doubt the contract between petitioner and Alcoa, upon its face, is wholly sufficient to make it appear that it is a contract between a public service corporation and a customer for the purchase and sale of secondary power. No doubt every wherefore and whereas to that end is included, and not a jot or tittle is omitted. Even so, the fact remains that this record will not sustain the contention that more than 81% of the petitioner's production is secondary power.

"Giving it the wrong label does not conjure away the reality, and no amount of judicial legerdemain can change its true character and make undependable that which is in fact dependable . . . Calling it secondary power does not make it so."

Corporations must operate on a profit motive basis. Not so with petitioner. Financed as it is, it can afford—indeed it proposes—to operate at an apparent loss. By so doing it can evade the payment of its fair portion of State and Federal taxes.

Unquestionably local customers of petitioner enjoy special benefits from the arrangement now in existence between it and Alcoa, and the arrangement has contributed to the development of the extreme western section of North Carolina. Local customers are entitled to these benefits in exchange for the special advantages and privileges acquired and enjoyed by petitioner and its parent corporation. It could well afford to retail the minor percentage of its total product which it sells to local customers in exchange for these privileges. Certainly the mere fact its rates are lower than those of other companies who are not financed and controlled by a giant parent-customer does not justify increasing the cost to Mead by $2,000 per month so as to further protect Alcoa and assure the continued delivery to it, at cost, of more than 80% of petitioner's total output of electric power.

Judge Gwyn's judgment reversing the order of the Utilities Commission appears in full in the statement of facts which accompanies the majority opinion. I therefore refrain from quoting some of the more striking and thought-provoking comments and observations therein contained. (See p. 456 *et seq.* of majority opinion.) Suffice it to say at this time that they should command the careful attention of all the right-thinking citizens of the State.

Judge Gwyn possesses a fine judicial temperament and sound judgment. His fairness to all litigants is generally recognized. He is painstakingly deliberate in the discharge of his judicial duties. He has never posed as the guardian and protector of "the people" against the "predatory aims of entrenched wealth." I am therefore confident that he incorporated these pertinent comments in his judgment only after long and prayerful consideration. In my opinion, the facts disclosed by this record fully justify what he has to say.

Neither this Court nor his can give relief against the conditions he so graphically points out. Yet his comments should serve to give notice to the public officials or agencies, having the power to act, that the time is at hand when these conditions should receive prompt and careful attention. If they will only cut through the form to the substance, they will find just another hydroelectric power producing agency of Alcoa, retailing just enough of its production—less than 20%—to permit it to pose as a *quasi*-public corporation with the right to use the water power resources of this State, exercise the power of eminent domain, and enjoy the other monopolistic privileges accorded a public utility while it was, in fact,

created and exists primarily to serve its master which seeks and must have low-cost hydroelectric power.

Fortunately, the corporations of North Carolina, both large and small, have diligently sought to exercise their corporate powers under the law in accord with the free enterprise concept of our form of government. Seldom indeed is a situation such as the one disclosed by this record brought to light in the course of litigation or otherwise. I am certain its parallel does not exist elsewhere in this State.

Perhaps some may think the question it poses is no concern of this Court or any of its members. Certainly this Court cannot remedy the condition in this proceeding. We may only decide the legal questions presented by the appeal. Even so, I would not surrender or forego the right to direct attention to the note of warning contained in Judge Gwyn's judgment in exchange for any office within the purview of our system of government.

It must be distinctly understood that nothing I have said is intended or should be construed as a criticism of attorneys who represent petitioner. It was entitled to counsel, and the attorneys selected are men of recognized ability and standing in the legal profession. They presented the cause of petitioner in a concise, logical, and forceful manner, in accord with the best traditions of the legal profession. In so doing, their conduct at all times has been above reproach.

I join the other members of the Court in voting to affirm the judgment entered in the court below.