STATE OF NORTH CAROLINA ex rel UTILITIES COMMISSION
AND CAROLINA POWER AND LIGHT COMPANY, APPLICANT V.
RUFUS L. EDMISTEN, ATTORNEY GENERAL; EXECUTIVE
AGENCIES OF UNITED STATES OF AMERICA; THE NORTH
CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC.;
AND BALL CORPORATION, INTERVENORS, PROTESTANTS

No. 7510UC604

(Filed 19 May 1976)

1. Electricity § 3; Utilities Commission § 6—interim rate increase—
   moot question

   Questions presented by the contention that the Utilities Commission committed reversible error by allowing an electric utility an additional interim rate increase after it had allowed one such increase are moot where the Commission's final order determined that a rate increase of almost twice the combined interim increases was just and reasonable.

2. Electricity § 3; Utilities Commission § 6—additional interim rate increase

   The Utilities Commission had authority, in the exercise of the discretionary power granted it by G.S. 62-134(b), to modify its order allowing an interim rate increase by granting an additional interim rate increase without basing such further order on new evidence of a type competent to support a final order in a general rate case.

3. Electricity § 3; Utilities Commission § 6—failure to order refund of interim rate increase

   The Utilities Commission did not err in failing to order a power company to refund revenues collected subject to refund during the pendency of a general rate hearing where the Commission found such revenues to be just and reasonable, notwithstanding the Commission in its final order approved new residential rate schedules which allowed no increase in basic rates for customers in the low use category and smaller than requested increases in basic rates for customers in the medium use category.

4. Electricity § 3; Utilities Commission § 6—return on rate base—return on equity

   The record in this case, considered as a whole, contains substantial evidence supporting the Utilities Commission's subjective judgment that 8.24 percent was a fair rate of return to be allowed on a power company's fair value rate base as determined by the Commission and that 10.44 percent was a fair rate of return on the power company's fair value equity which resulted from adding the fair value increment to the equity component in the capital structure.

5. Electricity § 3; Utilities Commission § 6—return on equity—increased revenues requested by power company

   The fact that the 10.44 percent return on fair value common equity of a power company allowed by the Utilities Commission pro-

duced the exact amount of increased revenues for which the power company applied does not show that the Commission acted arbitrarily or failed to comply with statutory procedures in fixing the power company's rates.

6. **Electricity § 3; Utilities Commission § 6— elimination of customer classifications**

The Utilities Commission did not err in approving the elimination of the previously established textile mill, high load factor, and military service customer classifications in a power company's rate structure.

7. **Electricity § 3; Utilities Commission § 6— changes in customer classifications — question presented**

Changes in established customer classifications of an electric utility may be approved by the Utilities Commission without a showing that the old classifications have become unreasonable because of some change in conditions or costs of rendering service, the question being whether the new classifications proposed by the utility are themselves reasonable.

Judge MARTIN dissents.

ON *writ of certiorari* to review final order of the North Carolina Utilities Commission entered 6 January 1975 in Docket #E-2, Sub 229. Heard in the Court of Appeals 12 November 1975.

This general rate case was commenced 29 October 1973 when Carolina Power and Light Company filed with the North Carolina Utilities Commission its application for authority to increase its retail rates for electricity sold in North Carolina by approximately 21 percent, the increases to become effective 1 December 1973. The proposed increases were not across-the-board, but varied as among various customer classes. On 9 November 1973 the Commission entered an order suspending the proposed increases, declaring this to be a general rate case, fixing the test period to be used in the general rate proceeding as the year ending 31 December 1973, and setting the case for investigation and hearing. In its application filed 29 October 1973 CP&L also applied for an 11 percent interim rate increase. After notice and public hearing, the Commission by order dated 25 January 1974 authorized an interim increase, subject to refund upon final hearing and determination, of 5.94 percent. On 22 February 1974 CP&L moved for permission to place into effect the remainder of the originally requested 11% interim increase, and on 1 April 1974 the Commission, after notice and public hearing, entered an order which authorized the additional

requested interim increase of 5.06% to be placed into effect subject to refund.

On 10 May 1974 CP&L gave notice of intention to place rate increases up to 20 percent into effect as provided in G.S. 62-135, and on 16 May 1974 the Commission, as provided in G.S. 62-135(c), approved CP&L's undertaking for refund. On 1 June 1974 CP&L placed the 20 percent increase into effect, subject to refund. The remaining portion of the requested increases in rates was placed into effect pursuant to G.S. 62-134 on 1 October 1974, after expiration of the 270 day period of suspension.

Nineteen days of public hearings were held on CP&L's application in Raleigh, Wilmington, and Asheville during July, August, and September 1974. At these hearings numerous witnesses were heard and many exhibits were introduced. Following these public hearings and after receiving briefs of the parties, the Commission entered its final order on 6 January 1975, making detailed findings of fact and conclusions, and approving the increased rates as applied for by CP&L. The order also approved the rate schedules essentially as filed for by CP&L, but with some slight downward adjustments in schedules affecting low usage customers.

To this order the Attorney General of North Carolina, the North Carolina Textile Manufacturers Association, Inc., the Executive Agencies of the United States of America, and Ball Corporation, intervenors and protestants, timely filed notice of appeal and exceptions. To permit perfection of the appeals of these parties, this Court on 12 June 1975 granted their petition for writ of certiorari.

*R. C. Howison, Jr., and William E. Graham, Jr., for applicant, Carolina Power & Light Company, appellee.*

*Edward B. Hipp, General Counsel, and Assistant Commission Attorney Wilson B. Partin, Jr., and Associate Commission Attorney Jane S. Atkins for North Carolina Utilities Commission, appellee.*

*Attorney General Edmisten by Deputy Attorney General I. Beverly Lake, Jr., and Assistant Attorney General Robert P. Gruber for the Attorney General, appellant.*

*Hovis, Hunter & Eller by Thomas R. Eller, Jr., for the North Carolina Textile Manufacturers Association, appellant.*

*United States District Attorney Thomas P. McNamara and R. C. Hudson for Executive Agencies of United States of America, appellant.*

*Broughton, Broughton, McConnell & Boxley by J. Melville Broughton, Jr., for Ball Corporation, appellant.*

PARKER, Judge.

### Appeal by the Attorney General

In its application filed 29 October 1973, CP&L asked the Commission to allow the entire 21 percent increase applied for to become effective on 1 December 1973 without suspension. In the event, however, that the Commission should deny this request and should suspend the proposed rate increases, CP&L prayed that the Commission permit it to place in effect an 11 percent interim increase. On 9 November 1973 the Commission did suspend the increased rates but did not immediately allow the 11 percent interim increase. Instead, on 25 January 1974, after notice and public hearing, it allowed an interim increase of only 5.94 percent. Later, on 1 April 1974, on CP&L's motion and after further notice and public hearing, the Commission entered its order allowing the remaining 5.06 percent of the originally requested 11 percent interim increase to go into effect, subject to undertaking and refund.

On this appeal the Attorney General contends that the Commission committed reversible error in entering its order of 1 April 1974 and in support of that contention advances three arguments as follows: (1) The only new evidentiary support for the 1 April 1974 order consisted in evidence and exhibits showing CP&L's declining per share earnings, declining returns on book equity, and deterioration in coverage of its fixed charges, and such data does not furnish a legally competent basis for the Commission's order allowing an increase in rates charged North Carolina customers, since it clearly relates to CP&L's company-wide operations which include its operations in South Carolina and its operations subject to the jurisdiction of the Federal Power Commission. (2) The findings of fact and conclusions as contained in the order entered after notice and public hearing on 25 January 1974, which allowed only 5.94 percent of the requested 11 percent increase, should remain intact, since in absence of further competent evidence upon which to base the granting of the additional

5.06% interim rate increase all material issues raised by the application for the 11 percent interim rate increase were adjudicated and resolved by the 25 January 1974 order. (3) No competent evidence was presented to show a change in CP&L's circumstances such as to warrant a change in the amount of the interim rate increase allowed. We do not find these arguments persuasive.

[1] At the outset we observe that the questions presented by the Attorney General's contention that the Commission committed reversible error by entering its 1 April 1974 order are now moot. By the final order entered 6 January 1975 the Commission found, after lengthy public hearings and after making extensive findings of fact on the basis of data relating to a test period ending on 31 December 1973, that rates permitting a 21 percent rate increase, almost twice the combined interim increases approved by the 25 January and 1 April 1974 orders, were just and reasonable. The Attorney General, who represents the using and consuming public in this proceeding, has failed to show that the rights of those whom he represents were impaired because for a period of time CP&L's customers were required to pay only approximately one-half of the increase in rates which the Commission ultimately determined CP&L was justly entitled to receive.

[2] Quite apart from any question of mootness, we find no error in the Commission's interim order of 1 April 1974. The power granted the Commission by G.S. 62-134 to suspend a requested change in rates is a discretionary one which the Commission may, but need not, exercise. *Utilities Comm. v. Morgan,* 16 N.C. App. 445, 192 S.E. 2d 842 (1972). In the opinion in that case we observed that nothing in the statute indicates a legislative intent that once the Commission exercises its discretionary power and suspends rates, it thereby necessarily exhausts its authority in that regard so as thereafter to be precluded from withdrawing or modifying the suspension, and we affirmed an order of the Commission, entered after a requested increase in rates had been suspended, which withdrew the suspension and allowed the new rates to become effective on an interim basis and subject to refund pending final hearing and determination. In the present case the Attorney General does not challenge the Commission's order of 25 January 1974 by which it modified its previous suspension order and permitted an interim increase of 5.94 percent to go into effect. His

position on this appeal seems to be that the Commission, once having entered that order, was thereafter precluded from modifying it by a further interim order unless the further order is based on new evidence of a type competent to support a final order in a general rate case and sufficient in itself to show a material change in conditions. We find nothing in the statute which places such a limitation on the Commission's discretionary authority. On the contrary, the discretionary power granted the Commission by G.S. 62-134(b) to suspend a proposed change in rates for a period not longer than 270 days clearly includes the lesser power to suspend a portion of the change for some lesser period, and "nothing in the language of the statute suggests that the Legislature intended that the Commission could exercise the discretionary authority granted it only if it did so on an all-or-nothing, once-and-for-all basis." *Utilities Comm. v. Morgan, Attorney General, supra,* p. 451. Accordingly, we hold that the Commission had the authority, in the exercise of the discretionary power granted it by G.S. 62-134(b), to enter its order of 1 April 1974 by which it modified its earlier discretionary order of 25 January 1974. Before entering each of these orders the Commission held a public hearing, as it was authorized but not required to do. Since both orders could have been validly entered even without any public hearing, we find no merit in appellant's contention that the second order was not lawfully entered because not supported by new evidence of a type competent to support a final order in a general rate case. In deciding whether to exercise its discretion by entering the second order, the Commission was entitled to look at and make a fresh appraisal of all of the evidence before it, including all data filed with the original application on 29 October 1973 and all evidence presented prior to entry of the 25 January 1974 order. The burden is on the appellants to show an abuse of the Commission's discretion in entering its interim order of 1 April 1974 by which it further modified its previously entered suspension order to permit an additional 5.06 percent increase to go into effect. On this record no abuse of the Commission's discretion is shown. Appellant's assignments of error directed to the Commission's interim order of 1 April 1974 are overruled.

[3] In its final order dated 6 January 1975 the Commission approved new residential rate schedules which allowed no increase in basic rates for customers in the low use category and smaller than CP&L's requested increases in basic rates for

customers in the medium use category. Nevertheless, the Commission expressly found all revenues collected subject to refund during the pendency of this proceeding to have been "just and reasonable," and in accord with this finding cancelled CP&L's undertaking to refund. Appellant Attorney General assigns error to this action. The precise question presented by this assignment of error has already been decided by this Court in *Utilities Comm. v. Edmisten, Attorney General,* 26 N.C. App. 613, 216 S.E. 2d 743 (1975). On authority of that case, this assignment of error is overruled.

[4] The Attorney General next challenges, as being arbitrary, capricious, and unsupported by competent, material, and substantial evidence in the record, the Commission's finding in its order of 6 January 1975 that CP&L was entitled to a return of 10.44 percent on fair value common equity and additional gross revenues of $11,846,000 for fair value. Consideration of the questions raised by this challenge requires that we first analyze the steps followed by the Commission in arriving at the rates finally approved in this case. As required by G.S. 62-133(b)(1), the Commission first ascertained the fair value of CP&L's property used and useful in providing retail electric service in North Carolina as of the end of the test period. The Commission determined this to be $885,355,000. (This figure was arrived at in the following manner: (1) Reasonable original cost of electric plant was found to be $891,313,000, from which there was deducted reasonable accumulated depreciation of $161,065,000 and contributions in aid of construction of $3,843,000, leaving a net original depreciated cost of $726,-405,000, (2) Reasonable replacement cost was determined to be $1,026,186,000. (3) Fair value was derived by giving two-thirds weighting to net original depreciated cost of $726,405,000 and one-third weighting to replacement cost of $1,026,186,000, resulting in a fair value for electric plant of $826,332,000. To this was added an allowance for working capital, found to be reasonable in the amount of $59,023,000, resulting in a determination of the fair value rate base of $885,355,000. The Attorney General does not challenge any of these figures or the method followed by the Commission in arriving at its determination of the fair value rate base.) After estimating CP&L's revenue under its present and proposed rates and ascertaining its reasonable operating expenses, as required by G.S. 62-133(b)(2) and (3), the Commission, as required by G.S. 62-133(b)(4), fixed the fair rate of return on the fair value rate base at 8.24

percent. The Commission, as required by G.S. 62-133(b)(5), then fixed rates which permitted CP&L to earn, in addition to reasonable operating expenses, the rate of return which the Commission found to be fair on the fair value rate base as determined by the Commission. In arriving at its conclusion that 8.24 was a fair rate of return, the Commission analyzed the effect of inserting pro forma the fair value rate base as determined by the Commission into CP&L's balance sheet, and found that the result was to increase book common equity by $99,-927,000. (The difference between $826,333,000, the fair value of electric plant as determined by the Commission in the manner noted above, and $726,405,000, the net original depreciated cost of electric plant.) The addition of this increment to book common equity increased common equity from $250,489,000 to produce a fair value common equity of $350,416,000, and changed the ratio of equity in the capital structure from 31.89 percent to 39.58 percent. Allocating the net earnings to be derived from the new rates to the pro forma revised capital structure resulted in a rate of return on the fair value equity of 10.44 percent. The Commission found 12.5 percent to be a fair return on book common equity. It concluded that "[t]he required rate of return on fair value equity is reduced by the resulting change in capital structure, based upon the reduced risk to the equity component," and the Commission found that 10.44 percent was a fair rate of return on the resulting fair value equity. It is this finding that 10.44 percent was a fair rate of return on fair value common equity which the Attorney General now challenges as being arbitrary and capricious and unsupported by competent, material, and substantial evidence.

In his brief, the Attorney General states his contention as follows: "The approach used by the Commission was as a general proposition proper, but the error complained of arises from the fact that there is no evidence in the record to support the Commission's conclusion that the cost of equity for CP&L decreases from 12.5 percent to 10.44 percent as equity increases from 31.89 percent to 39.58 percent." We find no error.

At the outset we note that at almost every step along the way in a general rate case the Utilities Commission, in following the procedure prescribed by G.S. 62-133(b), is required to exercise a subjective judgment. For example, the weighting to be given the respective indications of "fair value," the determination of the total amount reasonably necessary for work-

ing capital, and the determination of what constitutes a fair rate of return, all require exercise of a subjective judgment by the Commission. "When the record, considered as a whole, contains substantial evidence supporting the subjective judgment of the Commission on any of these factors in the fixing of reasonable rates, the conclusion reached by the Commission may not be disturbed by a reviewing court merely because the court's subjective judgment is different from that of the Commission, nor is the Commission required to accept as conclusive the subjective judgment of a witness, even though the record contains no expression of a contrary opinion by another witness." *Utilities Comm. v. Power Co.*, 285 N.C. 398, 415, 206 S.E. 2d 283, 296 (1974). We find that the record in the present case, considered as a whole, does contain substantial evidence supporting the Commission's subjective judgment that 8.24 percent was a fair rate of return to be allowed on CP&L's fair value rate base as determined by the Commission and that 10.44 percent was a fair rate of return on CP&L's fair value equity which resulted from adding the fair value increment to the equity component in the capital structure.

The Attorney General's own witness, David A. Kosh, who was recognized by the Commission as an expert in economics, cost of capital, and fair rate of return, testified:

"The problems involved in determining the cost of capital and its major components are in substantial measure matters of judgment. Necessarily, so many factors enter into a determination of fair rate of return that many judgments have to be made. If, at each point where a judgment has to be made, or where a question has to be resolved, the benefit of any reasonable doubt is resolved in the direction of a lower cost, then the result will tend to be at, or in the direction of, the lower end of fair rate of return.

On the other hand, if most reasonable doubts, or questions, are resolved in the direction of a higher cost rate, then the end result will be at or near the upper end of the range or fair rate of return."

This testimony clearly points out the many subjective value judgments which the Commission, or anyone else, must necessarily exercise in arriving at a determination of fair rate of return. This witness, David A. Kosh, testified that he had made

a detailed study of the cost of capital and fair rate of return for CP&L. When he testified he did not, of course, know what the Commission would ultimately determine the fair value rate base should be. He did testify, however, that in his opinion 8.22 percent would be a fair rate of return if applied to a fair value rate base determined as being equal to 109.6 percent of depreciated original cost and that 10% was a fair rate of return on the fair value equity. These figures from the Attorney General's witness were remarkably close to the Commission's ultimate findings that 8.24 percent was the fair rate of return when applied to the fair value rate base which, as determined by the Commission, was 108.9 percent of depreciated original cost, and that 10.44 percent was a fair rate of return on fair value equity.

[5]   The Attorney General, pointing to the fact that a 10.44 percent return on fair value common equity produced the exact amount of increased revenues for which CP&L applied, contends from this fact that the Commission must have acted arbitrarily in selecting the figure of 10.44 percent in order to accomplish a preconceived objective. The fact stated, however, does not compel the conclusion drawn. That the Commission ultimately approved CP&L's application furnishes no proof that it acted arbitrarily. No rule of law requires the Commission to presume that the rates requested in a utility's application are excessive, nor does approval of the requested rates raise any presumption that the Commission failed to comply with the procedures specified in G.S. 62-133 (b) or with the mandate of G.S. 62-133 (a) to "fix such rates as shall be fair both to the public utility and to the consumer." Upon appeal, the rates fixed by the Commission under the provisions of G.S. Chap. 62 "shall be prima facie just and reasonable." G.S. 62-94 (e). On review of the entire record as submitted in this case, we find the Commission's findings, conclusions, and its decision in this case to be supported by competent, material, and substantial evidence, and we find that appellant Attorney General has failed to show that the Commission acted arbitrarily or capriciously.

*Appeals by the North Carolina Textile Manufacturers Association, Inc., Ball Corporation, and Executive Agencies of United States of America.*

[6]   In its application, filed 29 October 1973, CP&L, in addition to applying for an increase in rates, proposed to make a change in its rate structure to eliminate certain previously

established customer classification schedules. Among the schedules which it proposed to eliminate were the Textile Mill Schedule (TM), the High Load Factor Schedule (HLF), and the Military Service Schedule (MS). Customers formerly in these schedules were moved to a general service classification, Schedule G-3. In its order of 6 January 1975 the Commission, with certain modifications, approved the proposed changes in CP&L's rate structure. (The modifications made by the Commission related to low and medium use residential customers and resulted in practically no increase in basic rates for residential customers using less than 300 KWH monthly and smaller than the overall increase for residential customers using less than 725 KWH monthly.) The elimination of the TM, the HLF, and the MS classifications resulted in rate increases greater than the 21 percent overall increase for customers who were formerly in those classifications. The intervenors, the North Carolina Textile Manufacturers Association, Ball Corporation, and Executive Agencies of the United States of America, previously classified in the TM, HLF, and MS schedules respectively, contend that the Commission committed reversible error in that portion of its order of 6 January 1975 which approved elimination of the previously established textile mill, high load factor, and military service customer classifications. We find no error in this regard.

When this proceeding was commenced, CP&L had 35 different rate schedules for its customers. This compared with 10 to 15 rate schedules used by the typical electric utility. This proliferation in customer classifications was not the result of comprehensive planning made at any one time, but rather was the result of historical development which occurred during the period when CP&L, having an ample and growing supply of electric power available for sale, was engaged in promoting the increased usage of electric power by new as well as by its existing customers. In recent prior rate cases CP&L had applied for and been granted across-the-board increases, applying the same percentage increase to all rate schedules without changes being made in the customer schedules. The rate structure which resulted from this process favored the large-use customers by granting them lower KWH rates than charged the small-use customers. While, as noted above, the elimination of the TM, the HLF, and the MS classifications and the moving of customers from these eliminated schedules into the G-3 schedule resulted in rate increases greater than the average 21 percent

overall increase for customers formerly on the eliminated classifications, such customers, even after being placed in the G-3 schedule, still enjoyed lower KWH rates than those charged small-use customers. Appellants here, although still enjoying lower rates than charged residential and other small-use customers, nevertheless contend that the Commission committed error as a matter of law in approving elimination of the customer classification schedules in which they had formerly been placed.

[7] The gist of appellants' contention is that existing customer classification schedules, having heretofore been approved by the Commission in prior rate cases, must be deemed reasonable and cannot be changed except upon specific evidence, such as fully distributed cost studies, showing by its greater weight that existing approved rate differentials within or among customer classes or schedules are no longer just and reasonable. They further contend that in the present case there was no competent evidence showing CP&L's fully distributed costs of serving the customers formerly in the TM, HLF, and MS classifications, and that absent such evidence the Commission lacked lawful authority to approve any change in customer classification schedules. We do not agree with these contentions. It is true, of course that "[t]here must be no unreasonable discrimination between those receiving the same kind and degree of service." *Utilities Comm. v. Mead Corp.*, 238 N.C. 451, 462, 78 S.E. 2d 290, 298 (1953). The governing statutes, G.S. 62-140(a), expressly mandates that "[n]o public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service." We do not understand this to mean, however, that customer classifications, once established by a utility, must remain frozen absent a showing of change of conditions justifying a change in classifications. The question is not whether the old classifications, because of some change in conditions or of costs of rendering service, have become unreasonable. Rather, the question is whether the new classifications proposed by the utility are themselves reasonable. The simplied rate structure which resulted from the elimination of the TM, HLF, and MS schedules in the present case still provides customer classifications based upon substantial differences in conditions of service. The Commission has approved the new simplified rate structure, and on this appeal the Commission's determination in that regard must be deemed "prima facie just and reasonable." G.S. 62-94(e).

There is, of course, an almost infinite variety in the ways in which customers may be classified, and experts may differ as to which is the best. To be lawful the classification need not be one which a majority of experts consider to be the best and most reasonable. It need only be one which is based on reasonable differences in conditions and in which the variance in charges bears a reasonable proportion to the variance in conditions. Review of the record before us reveals this to be true of the rate structure and schedule approved in this case.

The order appealed from is

Affirmed.

Judge CLARK concurs.

Judge MARTIN dissents.